2:08 cv 1659 GGH

# United States District Court

District      EASTERN

| Name LIONEL NAVARRO | Prisoner No. B-91886 | Case No. |

**Place of Confinement**

SAN QUENTIN STATE PRISON, SAN QUENTIN, CA 94974

| Name of Petitioner (Include name under which conviction | Name of Respondent (authorized person having custody of petitioner) |

LIONEL NAVARRO            ROBERT AYERS, JR., Warden, et al

V.

The Attorney General of the State of:    **CALIFORNIA**

## PETITION

1. Name and location of court which entered judgment of conviction under attack    Tulare County Superior Court

2. Date of judgment of conviction    November 10, 1977

3. Length of sentence    Seven years-to-life with possibility of parole on or after May 15, 1984.

4. Nature of offense involved (all counts)    First degree murder and attempted robbery with use of a weapon, a metal pipe.

5. What was your plea? (Check one)

   (a) Not guilty    [X]
   (b) Guilty    [ ]
   (c) Nolo contendere    [ ]
   If you entered a guilty plea to one court or indictment, and a not guilty plea to another court or indictment, give details:

6. If you plead not guilty, what kind of trial did you have? (Check one)

   (a) Jury    [X]
   (b) Judge only    [ ]

7. Did you testify at the trial?    No

**FILED**

JUL 1 8 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
     DEPUTY CLERK

Yes ☐ No ☒

8. Did you appeal from the judgment of conviction?

Yes ☒ No ☐

9. If you did appeal, answer the following

(a) Name of court ___California Court of Appeal, Fifth Appellate District.___

(b) Result ___Denied___

(c) Date of result and citation, if known ___Unknown___

(d) Grounds raised _____

_____

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court _____

(2) Result _____

_____

(3) Date of result and citation, if known _____

(4) Grounds raised _____

_____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions,. applications, or motions with respect to this judgment in any court, state or federal

Yes ☒ No ☐

11. If your answer to 10 was "yes" give the following information:

(a) (1) Name of court ___Tulare County Superior Court___

(2) Nature of proceeding ___Habeas Corpus Petition___

_____

(3) Grounds raised ___Same as in instant petition.___

_____

(3)

(4)  Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐ No ☒

(5)  Result ___Denied___

(6)  Date of result ___Feb 29, 2008___

(b)  As to second petition, application or motion give the same information:

(1)  Name of court ___California Court of Appeal, Fifth Appellate District___

(2)  Nature of proceeding ___Habeas Corpus Petition___

(3)  Grounds raised ___Same as in instant petition___

(4)  Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐ No ☒

(5)  Result ___Denied___

(6)  Date of result ___April 25, 2008___

(c)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1)  First petition, etc.    Yes ☒ No ☐

(2)  Second petition,    Yes ☒ No ☐

(d)  If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

12.    State *concisely* every ground on which you claim that you ae being held unlawfully. Summarize *briefly* the facts supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same. CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court

remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date,

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base you allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favarable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel

(j) Denial of right of appeal.

A. Ground one: ___See Attached "INSERT A," Ground 1, pages 1 through 31___

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

B. Ground two: ___See Attached "INSERT B," Ground 2, pages 32 through 35___

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

C. Ground three: _See Attached "INSERT C," Ground 3, pages 36 through 42_

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

D. Ground four: _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give you reason for not presenting them: _____

_____

_____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes [X]  No [ ]

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing _____

(6)

INSERT A

### Ground 1

THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE AND
FEDERAL DUE PROCESS WHEN IT DID NOT APPLY THE PROPER CRITERIA
AND ITS DECISION DENYING PETITIONER PAROLE WAS NOT SUPPORTED
BY "PREPONDERANCE OF THE EVIDENCE" (Cal. Regs. Tit. 15 § 2000
subd. (50)), OR NOT EVEN "SOME EVIDENCE," THAT HE POSES A
CURRENT UNREASONABLE THREAT TO THE PUBLIC.

This petition addresses violations of petitioner Lionel Navarro

("Petitioner") state and federal due process rights at his fifteenth (15th)

subsequent hearing for parole before the Board of Parole Hearings ("Board"),

wherein he received a three year denial.

Petitioner was convicted of first degree murder and attempted robbery

with use of a weapon, a metal pipe, in Tulare County [Case Number 18308]

and sentenced to a term of seven years to life. Despite being disciplinary

free since 1990, Petitioner has been denied parole sixteen times and received

a three year denial at his 15 subsequent hearing again based on the commitment

offense being carried out in an "especially cruel and callous manner."

(Exhibit 1, Hearing Transcript ("TR") at 53.)

Petitioner asserts that the 2007 Board panel violated his state and

federal due process rights by failing to set his term in accordance with

Penal Code Section 3041, et. seq.: by engaging in an arbitrary and

unconstitutional determination that his crime was particularly egregious;

by failing to adduce any evidence that was probative of a finding that he

is currently dangerous; by failing to find him suitable for parole in

accordance with the Board's Regulations set forth in section 2280-2343 of

the Title 15, California Code of Regulations ("15-CCR"); and by violating

the due process requirements by applicable case law. Petitioner also maintains

that there was no evidence underlying the "reason" the Board articulated

for finding him unsuitable for parole and more importantly NO NOTICE that

he is currently dangerous.

The 2007 Board panel also cited other factors for denying parole. The

INSERT A

Board stated:

1.   Multiple victims were attacked or killed in the same incident.

2.   The victim was hit on the head with a metal pipe approximately three feet long, which was found at the scene. He was transported to Delta Hospital and died several hours later.

3.   [Y]ou have a juvenile history of burglary, an adult history of public intoxication, possession of a switchblade, assault with a deadly weapon. You do have a history of prior criminality that shows an escalating pattern of criminal conduct.

4.   And we don't feel you're an alcoholic, but you're an addict, a recovering addict at that. But he does not reconcile that with the need for a structured drug treatment program and you've made no plans for a drug treatment program.

5.   Also seemingly contradicted is his feeling that you in fact have insight and remorse and basically, we have no evidence of that.

6.   As to parole plans, you presented no documents for current parole plans and you don't appear to have realistic parole plans. Paroling back to an area that is still rife with gangs and drugs, so you may feel that you're to old to be a gang member, still the drugs are rife in that area and it's not clear that that would be the best plan for you and basically you don't have any documentation to support that.

(TR 53-57.)

     The 2007 Board denied Petitioner parole for three years, during which time he completed another two years of disciplinary free period, Anger Management, Narcotic Anonymous (NA), Prison Industry Authority (PIA) and recent psychologist evaluation supporting a finding of parole suitability.

     Petitioner contends that the Board's conclusion that he is unsuitable for parole and its failure to set a term despite his accomplishments and despite having served over 30 years (with good time credit, over 45 years) on a sentence of 7 years to life, twice the maximum in the Matrix guideline (15 CCR § 2282) for first degree murder, is clearly erroneous, arbitrary and capricious.

INSERT A

## PETITIONER'S CONTENTIONS

1. The Board failed to apply the statutory requirements of Penal Code section 3041.

2. Petitioner's Due Process rights were violated by the Board's failure to find him suitable for parole and set his term within the first degree murder Matrix Guidelines, between 8 to 22 years. (15 CCR § 2282 (A)(1)-(D)(IV).)

3. The Board improperly and arbitrarily characterized Petitioner's crime as being exceptionally egregious.

4. There was no reliable evidence before the Board that provides a nexus to Petitioner's November 10, 1977 crime and him being currently dangerous.

5. There was no evidence with any indicia of reliability underlying the reasons the Board gave for finding Petitioner unsuitable for parole.

6. The Board's decision was arbitrary and capricious and ignored or minimized Petitioner's rehabilitative efforts and gains. The Board's recommendations are vague and provide no information on what is needed for Petitioner to become suitable for parole, other than boilerplate language used in every hearing, and illegally requiring him to discuss the commitment offense.

7. The Board's weighty and unreasonable reliance on unalterable factors including the crime itself violates his Due Process rights. The Board has in effect resentenced Petitioner from a term of seven years to life, to life without the possibility of parole. (See Cal. Penal Code Section 190.2 (a)(14); and Section 190.4.)

8. The Board arbitrarily denied parole for THREE years despite the lack of any adverse factors in his programming since 1990. A three year denial was arbitrary and violated Petitioner's Due Process rights. (See Ground 2, INSERT B of petition.)

9. At this point, the CDC-115's (disciplinary reports) are no longer evidence of unsuitability. They have been used to punish Petitioner already once and the records shows that Petitioner has overcome his disciplinary issues through the significant programming and working in NA, anger management, CAT T program, and PIA.

   **A.   Petitioner Has a Federally Protected Liberty Interest In Parole And A Right To A Parole Hearing That Complies With Due Process.**

   A California prisoner with a sentence of a term-to-life with the possibility of parole has a protected liberty interest in parole therefore

INSERT A

a right to due process in the parole suitability proceedings. See Sass v. California Board of Prison Terms ("Sass"), 461 F.3d at 1127-28 (9th Cir. 2006ǀ; Greenholtz v. Inmates of Nebraska Penal Corr. Complex ("Greenholtz"), 442 U.S. 1, 7 (1979); Board of Pardons v. Allen ("Allen"), 482 U.S. 369, 373 (1987); Cal. Penal Code § 3041 (b).

B.   The California Parole Scheme Requires That Parole Shall Normally Be Granted At The Initial Parole Consideration Hearing To Be Held 13 Months Prior To Inmates' Minimum Eligible Parole Dates.

The California Legislature has clearly expressed its intent that when murderers – who are the great majority of inmates serving indeterminate sentences – approach their minimum eligible parole date, the Board "shall normally set a parole release date." (Pen. Code § 3041, subd.(a).) The Board's authority to make an exception based on the gravity of a life term inmate's current or past offense should no operate so as to swallow the rule that parole is "normally to be granted." In re Rosenkrantz, supra, Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.

The Board denies due process and fails to act impartially by denying parole to approximately 95 percent of the inmate it reviews for parole suitability

Petitioner contends that a as matter of law and logic, a parole granting rate of five percent by the Board fails to comply with the mandates of Penal Code § 3041(a) which requires that parole is normally to be granted. Petitioner maintains that applying the exception of Section 3041(b) to well over ninety percent of the applicants considered by the Board violates due process.

C.   The Matrix Is Designed To Quantify The Factors Present In Murders Considered By The Board. The Board Violates Due Process In Denying Parole Based On A Crime Being "Exceptional" When The Matrix Already Takes Those Factors Into Account.

The Board ignores the existence and purpose of the matrix when

4.

INSERT A

considering whether a crime is "exceptionally, heinous, atrocious or cruel." Such a position is untenable. "It is well-established rule of statutory construction that when a word of phrase as been given a particular scope or meaning in one part or portion of a law it should be given the same scope and meaning in other parts or portion of the law." People v. DeGuzman (2003) 113 Cal.App.4th 538, 547-548, citing People v. Mckay (2002) 267 267 Ca.4th 601, 621. The Board copied the language from Cal. Penal Code § 190.2, a "Special circumstance" applicable only to particularly egregious first degree murders punishable by the "death penalty or life imprisonment without parole." Subsection (a)(14) of the special circumstances statute. Cal. Penal Code § 190.2, reads, "the murder was especially heinous, atrocious, or cruel" which, the statute explains, means "manifesting exceptional depravity ... a conscious or pitiless crime that is unnecessarily tortuous to the victim." This element, according to Cal. Penal Code § 190.4, must be found true by a jury. Accordingly, the Board deemed Petitioner a current unreasonable risk to public safety by arbitrarily characterizing his commitment offense as a special circumstance first-degree murder. Because, despite its egregious, Petitioner's offense was clearly not in that category, the decision on that basis abrogated due process.

Since it is clear within one part of the statutory scheme governing parole that there is a mandatory framework for quantifying the severity of any given instance of murder, it seems equally clear that the Board is precluded from adopting contrary standards for similar and related parts of the same scheme.

Federal case law explains that the Board's decision to deny parole in this case based on a finding that the crime was exceptional masks an underlying decision that the crime is "more serious than the 'ordinary'

INSERT A

[murder] contemplated by the published guidelines. There is no basis in law
for such a distinction. The guidelines clearly indicate the class of offense
severity into which a case falls, based on the act committed..." As explained
in Little v. Hadden, 504 F.Supp. 583, 564 (1980), "... It is unreasonable
and impermissible for the [Board] to base a decision to continue beyond the
guidelines on the same factors that went into formulating the guidelines
in the first place. No one disputes that this was a serious crime, but the
factors of seriousness indicated by this record are included in the guidelines
themselves. Thus, something more must be stated. The [Board] however, has
failed to state any other basis that is supported by any evidence."

    D. The "Some Evidence" Standard Requires That There Be Some Evidence
That Is Probative Of Current Dangerous.

    Due Process requires that "some evidence" support the parole board's
determination and that the evidence relied upon must possess "some evidence
of reliability." Caswell v. Calderon, 353 F.3d 832, 839 (9th Cir. 2004).
See Cass v. Woodford, 2006 WL 1304953 at *9 (S.D. Cal. 2006).

    It is not enough that there is some evidence to support the factors
cited for denial of parole; the evidence must also rationally support the
core determination required by the statute before parole can be denied, i.e.,
that a prisoner's release will unreasonably endanger public safety. In re
Lee (2006) 143 Cal.App.4th 1400, 1408. Because the overarching consideration
is public safety, the test in reviewing the Board's decision denying parole
"is not whether some evidence supports the reasons [the Board] cites for
denying parole but whether some evidence indicates a parolee's release
unreasonably endangers public safety." In re Barker (2007) 151 Cal.App.4th
346, 366 (italic omitted).

    The Federal "Some Evidence" standard as applied in Rosenkrantz v.
Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063 and Martin v. Marshall (N.D.

INSERT A

Cal. 2006|| 431 F.Supp.2d 1038 finds that an aging commitment offense falls short of providing "some evidence" sufficient to justify a denial of parole. See also. Willis v. Kane (N.D. Cal. 2007) 485 F. Supp.2d 1126.

The "some evidence" standard is not appropriate at the fact finding level but only suitable use by an appellate court in the context of reviewing lower court decisions. The Supreme Court recently explained in a plurality opinion that it has utilized the "some evidence" standard not as a standard of proof, but rather as a standard of review when examining an administrative record developed in an adversarial proceeding. Hamdi v. Rumsfield, 542 U.S. 5507, 124 S.Ct. 2633, 2651, 159 L.Ed.2d 578 (2004), n. 8.

E.  The Board's Reliance On The Commitment Offense And Immutable Pre-Conviction Factors To Deny Parole Violates Petitioner's Due Process Rights.

In Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, the Ninth Circuit cautioned that continued reliance on the circumstances of the offense could result in a due process violation if the prisoner continually demonstrates exemplary behavior and evidence of rehabilitation. The Board's decision to deny parole in this case relied on the commitment offense and petitioner's conduct prior to the commitment offense.

The Board's characterization of Petitioner's crime as exceptional was arbitrary since the Board routinely and invariably characterizes all first and second degree murders as exceptional. (The Court is requested to take judicial notice of the pleadings and records in the matter of In re Morris Bragg, on Habeas Corpus, Case No. 108543; In re Jameison, on Habeas Corpus, Case No. 71194; In re Criscione, on Habeas Corpus, Case No. 71614, where Santa Clara County Superior Court, the Honorable Linda Condron, found comprehensive evidence indicating that the state's Board of Parole Hearings completely disregards the detailed standards and criteria of the parole release statute, 15 CCR § 2402(c.), and thereby denies prisoners' due process

7.

INSERT A

rights; and <u>Stephen Liebb v. Jill Brown</u>, Case No. 04-4213 CW (JL), Northern District of California, where Honorable District Judge Claudia Wilkins found that Liebb has good cause for determining whether the Board routinely categorizes convicted life-term murders as exceptional in order to deny parole and whether such a policy is in violation of a prisoner's due process rights.」 It is clear that in the case of 15 CCR § 2280, subds, (c.)(1)(A)-(E), and § 2402, subd. (c)(1)(A)-(E). the guideline fails to adequately inform the Board how to determine crime factors to render the crime "exceptional."

The California Court of Appeal in <u>In re Elkins</u> (2006) 144 Cal.App.4th discussed the use of the gravity of the commitment offense to support a denial of parole: "<u>Scott II</u> summarizes the law in this situation. 'The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis on the commitment offense 'alone' is correct [citation], but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence')."

"The Commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." <u>In re Tripp</u> (2007.) 150 Cal.App.4th 306. 319..

In the case <u>In re Dannenberg</u> (2005) 34 Cal.4th 1061 (<u>Dannenberg I</u>), the California Supreme Court addressed what standard was valid for not finding the prisoner suitable for parole. In that case, Dannenberg was convicted of a second degree murder when he got into a fight with his wife, repeatedly beat her on the side of her head with a pipe wrench rendering her unconscious, and then Dannenberg drowned her in their bathtub. (<u>Id</u>. at p. 1073.) The parole board fond the primary reason for not granting parole was the especially

INSERT A

cruel manner in which the murder was carried out. (Id. p. 1074.) Dannenberg
claimed his wife must have lost consciousness from hitting her head on the
bathtub spout and not from the blows he rendered with the pipe wrench. (Id.
at p. 1073.) The jury did not believe Dannenberg, and neither did the parole
board. The parole board found Dannenberg did not take responsibility for
his crime, and therefore continued to be unpredictable and remained a threat
to others if released. (Id. at pp. 1075, 1095.) The Supreme Court found,
in a three to four decision, that there was "some evidence" the crime was
"especially callous and cruel" and there was little doubt the crime went
beyond the minimum elements of a second degree murder, a requirement that
must be shown in order to deny parole solely based upon the commitment
offense. (Id. at p. 1095.)

Recently, Dannenberg II was published. The Sixth Appellate District
held the Governor's reversal of a BPH finding of suitability was not supported
by some evidence and cannot be upheld. Because the evidence did not support
the Governor's reversal, it would be futile to remand the matter to the
Governor. (In re Dannenberg, supra, ____ Cal.App.4th at p. 9.) "While
Dannenberg's commitment offense was grave, the record that was before the
Governor lacks **any** evidence that now, more than two decades after his offense,
the nature of Dannenberg's offense alone continues to support a conclusion
that he poses an unreasonable risk to society if released. (Ibid). The test
is not whether some evidence indicates a parolee's release unreasonably
endangers the public, but whether some evidence exists that support's the
Governor's conclusion that release of the inmate would pose an unreasonable
risk to the public. (Id. at p. 8.)

Irons v. Carey (9th Cir. 2007) 479 F.3d 658 ("Irons") is the Ninth
Circuit's third in a line of cases that includes Biggs v. Terhune (9th Cir.

9.

INSERT A

2003) 334 F.3d 910 ("Biggs"), and Sass v. California Board of Prison Terms

(9th Cir. 2006) 461 F.3d 1123 ("Sass"), looked at the continued use of the

commitment offense to justify a denial of parole.

F.   The Board's Determination That A Crime Is Particularly Cruel Or
Egregious Is Made In An Arbitrary And Unconstitutional Manner.

The Board's determination that a murder is especially cruel or egregious

is unconstitutionally vague and standardless. See United States v. Doremus

(9th Cir. 1989) 888 F.2d 630, 634.

The Board relies on any fact of the crime to bolster its conclusion

that the crime is particularly egregious. The Board makes a determination

that virtually All murders are particularly egregious.

The Board's use of unchanged and unproven elements of Petitioner's crime

to continue denying parole violates his constitutional right to a jury trial.

See Aprendi v. New Jersey, 530 U.S. 466, 490; and Cal. Penal Code § 190.4.

G. The Board's Finding That Petitioner Needed Show Insight And Remorse
Lacks Evidentiary Support And Are Not Evidence Of Unsuitability.

The Board stated: "We felt that the doctor in saying you have insight

and remorse -- we don't know where he got that because you certainly really

didn't discuss it in any detail with him. You haven't internalized AA/NA

steps despite years of attendance." (TR 61.) This conclusion is refuted by

three decades of vocational training and positive programming within prison

as is documented in the Board Report. Compliance with the Board's

recommendations is a factor to be considered in favor of suitability and

release no matter how long-standing or recent it is. See In re Lee (2006)

143 Cal.App.4th 1404, 49 Cal.Rptr.3d 931; also see In re Elkins (2006) 144

Cal.App.4th 475.

15 CCR § 2236 is unequivocal in its demands that when a prisoner
"refuse[s] to discuss the facts of the crime in which instance a decision
shall be made based on the other information available and the refusal shall
not be held against the prisoner...." In the instance case, it is clear that
Petitioner's refusal to talk about the crime was held against him. Although
the Board recognized that Petitioner has "worked well" and should "be
commended for that[,]" it stated that "seemingly contradicted is [his] feeling
that you in fact have insight and remorse and basically, we have no evidence
of that." (TR 55, 56.) Had the Board reviewed Petitioner's entire
incarceration history it would have found that he had shown insight and
remorse through his programming and psychological evaluations. 15 CCR §
2281(d)(3) states: "(3) Signs of Remorse. The prisoner performed acts which
tend to indicate the presence of remorse, such as attempting to repair the
damage, seeking help for or relieving suffering of the victim, or the prisoner
has given indications that he understands the nature and magnitude of the
offense. Petitioner's behavior had been exemplary. The Board did not consider
it, if it had, the result would have been different. Petitioner's Central
file reveals that Petitioner has met the requirements to be found suitable.

1.  Petitioner's Programming

Petitioner had been free of discipline since 1990, a period of over
17 years. During the course of his 30 years (at the time of the 2007 hearing)
in custody, Petitioner received four CDC-115 violations, all for non-violent
violations. In addition, Petitioner has maintained the lowest possible
classification score since January 3, 1992.

2. Work, Education, and Self-help Therapy

a.  Work

Petitioner has an excellent work record while in custody. He has

11.

INSERT A

completed two vocational certificates, receiving one in Dry Cleaning and one in Bakery. In addition to his vocational accomplishments, Petitioner has been involved in Prison Industry Authority (PIA), Joint Venture and Mill and Cabinet where he regularly received exceptional work chronos. While working in Joint Venture, Petitioner saved approximately $1,700, paid restitution and provided regular support payments to his mother.

Throughout his period of custody, Petitioner has consistently been lauded as an "excellent" and "outstanding" worker who gets along with staff and inmates. With respect to his work skills, Petitioner has been described as a "quick learner," "consistent," "dependable," "cooperative," and "an asset." In sum, Petitioner's work history is beyond repute.

**b. Education**

Petitioner received his GED in 1987, and has continued to educate himself by reading in his spare time.

**c. Self-help and Therapy**

Though Petitioner has never been diagnosed with mental illness, he has participated in self-help and therapy programs throughout his entire term in custody. Petitioner was involved in both group and individual therapy. Petitioner completed a year of group therapy in 1988. He was also in the CAT T program at CMF, and prior to that he had approximately three years of individual psychotherapy, ending in 1985.

Since then, Petitioner has focused upon his past problems with substance abuse. In this respect, Petitioner began participating in Alcoholics Anonymous (AA) in 1987 and Narcotics Anonymous (NA) in 1988. He has continued his involvement with NA during the course of his time in custody and plans to remain in NA upon his release.

**3. Psychological Evaluations**

12.

INSERT A

Petitioner has obtained positive and supportive psychological evaluations for over 22 years, the great majority of which have been consistently supportive of parole. Beginning in 1986, for a period of approximately 22 years at the time of the 2007 hearing, Petitioner began receiving positive psychological evaluations.

a. 1986 Psychological Evaluation

Dr. Philip Hicks, M.D., analyzed Petitioner on May 30, 1986, in preparation for Petitioner's parole consideration hearing. Dr. Hicks had evaluated Petitioner the prior year, and his fellow—up evaluation noted significant improvement. In particular, Dr. Hicks found:

> The aspects of his personality described a year ago principally as antisocial orientation appears to be modified somewhat in a positive direction. He seems to be more comfortable with himself, has less of a "chip on his shoulder" attitude and is somewhat more thoughtful about himself in relationship to others.... He appears to be maturing somewhat during the past year and no longer demonstrates active antisocial attitudes or behavior. He has remained disciplinary free, he has, however, avoided involvement with A.A. and this is recommended. No psychiatric treatment per se is indicated and his prognosis has improved over the last report.

b. 1987 Psychological Evaluation

On June 29, 1987, Dr. F.H. Ernst, M.D., evaluated Petitioner, noting a generally positive view of petitioner. Dr. Ernst described petitioner, stating:

> He is forthright in talking about himself, including admitting the demonstrated problem of talking about his offense. He describes other offenses clearly. He describes his past use of narcotics. He is open about his previously getting tattooed and his decision some years back to discontinue any more tattoos. He admits being a past drug user. He is clear about his lack of commitment during his use to any working activity; this was prior to coming to CDC. He is clear about the use of alcohol in his youth. He tells of having a quick temper in the past. Apparently that is not as much of a problem now as it used to be. This is especially borne out by the lack of disciplinaries.... Violence potential of the crime for which subject is committed is very high. This potential is estimated to have subsided and now be in the range of normal for the

INSERT A

institutional population.

Dr. Ernst concluded the evaluation with praise for petitioner, stating, "If not paroled, continued present program. Subject is to be commended for his work on himself, improving himself and his self-controls, plus also commended for his contributions to the institution."

c.    1988 Psychological Evaluation.

Dr. Issac Slaughter, M.D., evaluated Petitioner on July 27, 1988, and gave a very positive review of petitioner. Dr. Slaughter based his evaluation upon a year-long relationship with Petitioner as a member of his group therapy. Initially, Dr. Slaughter described Petitioner, stating:

> In all my contact with Mr. Navarro he has been found to be alert, cooperative, and in good control with his environs. He is always neat, prompt and courteous. He does not exhibit any overt thought disorder, delusion, hallucinations, or paranoid ideations.... His grasp, comprehension, and mental ability are above average. His judgment and insight are good.

In evaluating Petitioner's violence potential, Dr. Slaughter found, "While his commitment offense is one of ultimate violence, his violence potential at this time is assessed at a level lower than average for this population." Finally, Dr. Slaughter concluded, "It is my opinion that he has maximized the psychological gains available to his therapy and that there are no psychological contraindications to his being paroled. Any future decision made to not parole him must be based on other than psychological reasons."

d.    1989 Psychological Evaluation

On May 18, 1989, Dr. Bramley Benton, M.D., evaluated Petitioner and gave a very positive review of petitioner, stating, "In his incarceration, Navarro has improved considerably. He is able to socialize well and apparently has the respect of both, other inmates and custody. His violence potential is estimated not to exceed that of the average inmate. If paroled his violence

14.

INSERT A

potential would probably not be greater than it presently is." Dr. Benton concluded, "While incarcerated, further psychiatric intervention will probably not be required."

   e.   1990 Psychological Evaluation

On May 31, 1990, Dr. Clyde Martin, M.D., interviewed Petitioner and gave him a very positive review, finding that, "He seems to understand the causative factors of his crime. He has good self-understanding, positive attitudes, good motivation for change and seemed sincere in his rehabilitation." Dr. Martin also noted that, "In a less controlled setting, such as a return to the community, the inmate is considered likely to hold his present gains unless he returns to his drug and alcohol use." In conclusion, Dr. Martin found Petitioner's "violence potential outside a controlled setting in the past is considered to have been about the same as the average inmate. It is currently decreased."

   f.   1992 Psychological Evaluation

On June 22, 1992, Dr. Sophia Konstantinou, Ph.D. interviewed Petitioner and provided a psychological evaluation. Dr. Konstantinou noted that, "Based on history only, violence potential outside a controlled setting in the past is considered to have been average. At present, inmate Navarro is programming well vocationally and through weekly participation in Narcotics Anonymous meetings."

   g.   1994 Psychological Evaluation

On June 16, 1994, Dr. M.E. Roudebush, M.D., interviewed petitioner for approximately one half-hour. After the brief interview, Dr. Roudebush found, "While inmate Navarro is making a good institutional adjustment, he provides no basis for predicting that he would be able to make an acceptable adjustment in the free world."

INSERT A

h.   1995 Psychological Evaluation

On December 31, 1995, Dr. J. Temkova, Ph.D., interviewed Petitioner for approximately one half-hour and provided a limited analysis of petitioner. Dr. Temkova found that while petitioner was "polite," he was "quite guarded and provided very little if any information about himself and his behavior." Based upon the foregoing, Dr. Temkova was "unable to formulate any specific opinion."

i.   1998 Psychological Evaluation

On March 25, 1998, Dr. Les Carr met with Petitioner and conducted an in-depth clinical interview combined with psychological testing. Dr. Carr's findings were very supportive of release. Dr. Carr found petitioner to be "friendly and cooperative throughout the psychological examination." Based upon his in-depth analysis of petitioner, Dr. Carr found, "By history, Mr. Navarro can be classified as an antisocial personality. However, he has continued to make progress in developing goals and values more in line with being a responsible member of society. His acquisition of skills while incarcerated has been a significant factor contributing to his positive development and maturity." In conclusion, Dr. Carr recommended that "Mr. Navarro's release date can be based on other than psychiatric considerations."

j.   2000 Psychological Evaluation

On November 20, 2000, Dr. Susan Buchan, Ph.D. interviewed Petitioner and provided an extensive psychological analysis. Dr. Buchan's evaluation was extremely positive, finding Petitioner's prognosis to be "excellent," further stating that "[h]e has never had any symptoms of mental illness and he is a very strong minded person." In addressing Petitioner's conscious choice not to talk about the specific details of the commitment offense, Dr. Buchan noted that this is "surely not motivated by self-interest."

INSERT A

Further, with respect to the commitment offense, Dr. Buchan found that Petitioner "has sufficient insight into the behavior that led to his crime. He acknowledges that he was a drug addict since his early teenage years and was leading a crime-ridden life, without much constructive activity." Based upon this factor, Dr. Buchan declared, "It is very clear to me that he takes full responsibility for his crime and has deep remorse about participating. He particularly regrets the impact on the victim's family."

Dr. Buchan also addressed Petitioner's acknowledged past substance abuse problems, finding that, "Mr. Navarro's present lifestyle and persona are antithetical to drug and alcohol use. He is quite invested in his health and physical fitness. His major hobby is 'working out.' He runs for hours each day and he does a variety of strength training exercises. He does not seem at this time to be driven by impulse. Rather he is very self-disciplined."

Dr. Buchan assessed Petitioner's potential dangerousness as follows:

A.  Within a controlled setting: For many years now the subject has felt that he had moderated his temper and is no longer reactive in his behavior. This change is certainly underscored by his conduct in prison. He is consistently noted to be cooperative and constructive in occupational settings. Mr. Navarro has not had a CDC-115 for over a decade and he has not behaved violently in prison. He has had zero classification points since 1/2/92.

B.  If released to the outside community: Mr. Navarro is not considered as potentially dangerous if released to the outside community. Mr. Navarro's criminal behavior is related to substance use. He was intoxicated at the time of his life crime and he had for years been a heroin addict who ran the streets. He has consistently attended 12-step programs for the past 14 years. He knows the cost of drug and alcohol use. Of his past associates, most are dead or in prison. Mr. Navarro has lost several brothers to heroin addiction and crime associated with it. He knows better than to seek out this lifestyle. He wants to avoid the Central Valley, in order to stay away from influences that led him to prison. If forced to go there because of parole, he knows to stick to himself and to family. This is a very practical and strong-minded man. I am confident that he will do what it takes to stay out of prison.

INSERT A

> Significant risk factors/precursors to violence: As long as
> Mr. Navarro stays away from heroin and other drugs, which he
> is likely to do, there are no risk factors in this case.

In her summary, Dr. Buchan described Petitioner as "a moral person of

good conduct" who is "honest and straightforward in his assertion that he

would rather die in prison than speak of his crime. . . . He asks only to

be judged for his current conduct, for the person who he now." Dr. Buchan

ended her evaluation by concluding, "There is no psychological barriers to

the immediate parole of Lionel Navarro."

### k. 2004 Psychological Evaluation

On November 16, 2004, Dr. E. Zak Bencich, Ph.D., interviewed Petitioner

for approximately one hour. Dr. Bencich noted that Petitioner did express

remorse for his role in the commitment offense, specifically he felt empathy

towards the family members of the victim. In addition to expressions of

remorse, Dr. Bencich also commended Petitioner for his disciplinary free

behavior since 1990. In the end, Dr. Bencich's report was brief, and he did

not feel as though he had enough information from Petitioner in order to

provide a detailed analysis.

### l. 2007 Psychological Evaluation

On March 22, 2007, Dr. Starett, Ph.D., interviewed Petitioner and

evaluated his future propensity for violence to be in the low range. Dr.

Starrett rated Petitioner's overall risk assessment to be in the low range

compared to similar inmates. Dr. Starrett stated that "When asking the inmate

why he  participated or got involved in this crime, the inmate states he

does not like to talk about it. He says he was convicted. The inmate states

he refuses to think about it. He said, quote, it happened, everyone got hurt,

end of quote. He did not want to talk about it. The inmate states that he

feels bad about what happened. He cannot change it. He said, quote, it's

18.

INSERT A

been a long time, I don't like to talk about it, end of quote." (TR. 31-33.)

4. Parole Plans

At the 2007 hearing, Petitioner explained to the Board that his parole

plans have not changed since his previous hearings and that due to the death

of his brother, did not receive any updated letters of support. Mike Gunning,

Petitioner's Board appointed attorney explained as followed:

> He's developed marketable skills that he didn't have beforehand.
> He has apparently a very good work ethic and that will bode
> well for him upon release. And as the Board is well-aware,
> you don't need letters of support. There's nothing in Tittle
> 15 that indicates that. I understand the Boards asks that,
> but there's nothing in Title 15 to require that. He has
> marketable skills, they're viable, he does have old letters
> of support from his family. There's nothing to indicate that
> they have -- based on what I've seen or heard, that they are
> no longer in support, so I would submit that the same support
> that they've been providing him since 1983 are still in place.
> The only reason he didn't go and request new ones was because
> of the fact he lost someone in the family and he did [not]
> want to bother his family."

(TR 50.)

At the previous hearing, in 2005, Petitioner presented realistic parole

plans based upon his extensive familial support in the community. When

released, Petitioner plans to live in Famerville, Tulare County, California,

with his mother. He has also made alternative arrangements with his brother,

Raymond, who lives in Exeter, California. With regard to employment,

Petitioner has offers of employment from Alfred Munoz who owns a landscaping

business and his brother Hector. In addition, Petitioner is skilled in dry

cleaning, woodworking, and he has expressed interest in pursuing one of these

possible areas of employment.

D. Parole Suitability Proceedings

I. Initial Parole Consideration Hearing - August 9, 1983

On August 9, 1983, Petitioner attended his initial parole consideration

hearing. During the hearing, petitioner presented evidence of his

INSERT A

participation in AA, his good work reports, and his disciplinary-free behavior. After hearing the evidence of suitability, the Board denied parole based upon the following factors: (1) The commitment offense; (2) Prior criminal history; (3) Psychiatric factors; and (4) Institutional adjustment.

The Board denied parole for two years and recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade academically; and (3) Participate in self-help programs which will assist him in understanding the social factors of society.

2.  First Subsequent Parole Consideration Hearing - August 29, 1985

After considering Petitioner's record, the Board denied parole based upon the following factors: (1)The commitment offense; (2) Previous record; (3) Institutional behavior; (4) Psychiatric factors. The Board noted that petitioner had received a 115 disciplinary for possessing approximately 3 gallons of prison-made alcohol. In its conclusion, the Board recommended that Petitioner: (1) Be disciplinary-free; (2) Work towards reducing his custodial level so that program opportunities will become more available; (3) participate in a substance abuse program, such as AA; (4) Upgrade vocationally and educational.

3.  Second Subsequent Parole Consideration Hearing - August 27, 1986

Petitioner attended his third parole hearing and presented the Board with his disciplinary-free behavior. After the presentation of evidence, the Board denied parole for one year. In its decision, the Board cited the following factors: (1) Commitment offense; (2) Previous record; (3) Institutional behavior; and (4) Psychiatric factors. In its conclusion, the Board recommended that he: (1) Remain disciplinary free; (2) Continue to upgrade vocationally and educationally; and (3) Participate in self-help and/or therapy programming.

20.

INSERT A

  4. Third Subsequent Parole Consideration Hearing – August 28, 1987

  At his fourth hearing overall, Petitioner presented the Board with evidence of compliance with previous Board recommendations – disciplinary-free behavior, educational upgrading and completion of his GED, and positive work reports. After reviewing the evidence, the Board commended him "for his work performance and his overall positive institutional adjustment."

  Following the presentation of Petitioner's positive programming, the Board denied parole for one year. In its decision, the Board relied upon the following factors for its denial: (1) Commitment offense; (2) Previous record; (3) Psychiatric factors. In conclusion, the Board recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade vocationally and/or educationally; (3) Participate in self-help and/or therapy programming to address his past history of drug and alcohol dependence.

  5. Fourth Subsequent Parole Consideration Hearing – August 24, 1988

  At Petitioner's fifth overall hearing, the Board denied parole for one year. In its decision denying parole, the Board relied upon the following factors: (1) Commitment offense; (2) Previous record; and (3) Psychiatric factors.

  The Board noted that Petitioner had received a 115 on October 10, 1987, for possession of marijuana. Further, the Board commended Petitioner for obtaining his GED and for his excellent work record. In conclusion, the Board recommended that Petitioner: (1) Become disciplinary free; (2) Upgrade vocationally in an area that is of interest to the prisoner; (3) upgrade educationally; (4) Participate in self-help and/or therapy programming; (5) Remove tattoo if possible.

  6. Fifth Subsequent Parole Consideration Hearing – September 15, 1989

  On September 15, 1989, Petitioner attended his sixth parole hearing.

INSERT A

Following the hearing, the board denied parole for one year. Again, the Board cited the following factors in denying parole: (1) Commitment offense; (2) Previous record; (3) Institutional behavior; and Psychiatric factors.

The Board noted that Petitioner had received a 115 on August 23, 1989, for possession of a banned substance. In conclusion, the Board recommended that Petitioner: (1) Become disciplinary free; (2) Upgrade vocationally; (3) Participate in self-help and/or therapy programs.

7.  Sixth Subsequent Parole Consideration Hearing - August 13, 1990

At his seventh overall hearing, Petitioner presented evidence of his parole suitability, including his discipline free behavior, participation in NA and overall self-improvement.

Despite the evidence of suitability, the Board denied parole for seventh time. In its two-year denial, the Board specifically identified following grounds: (1) Commitment offense; (2) Previous record; (3) Institutional behavior; and (4) Psychiatric factors.

In conclusion, the Board recommended that Petitioner: (1) Remain disciplinary free; (2) Upgrade vocationally and/or educationally; (3) Participate in self-help and/or therapy programming.

8. Seventh Subsequent Parole Consideration Hearing - September 30, 1992

Petitioner attended his eighth parole hearing before the Board and presented significant evidence of suitability, including: exceptional work reports, committed participated in NA and vocational accomplishments. The Board wrote the first full decision of its findings, denying parole for two years. In the decision, the Board explained the reason for denying parole, stating, "Basically, it's because of the commitment offense itself. In which you and two other crime partners engaged in a murder of one, Mr. Gonzales over money." The Board also cited an escalating pattern of criminal conduct

22.

INSERT A

and violence, lack of programming, and the negative psychological evaluation.

The Board recommended that Petitioner "remain disciplinary-free, that you continue in metal fab, that you continue your NA, that you attend Breaking Barriers, that you attend a board group, that you attend vital issues and [inaudible]."

9. Eighth Subsequent Parole Consideration Hearing —August 16, 1994

At his ninth hearing, Petitioner presented the Board with evidence of his exceptional programming and suitability, as well as his vocational upgrading and commitment to NA — in substantial compliance with the past Board recommendations.

With the overwhelming evidence of suitability, the Board nonetheless denied parole for the ninth time based primarily upon the commitment offense. In its decision, the Board found:

> The offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another. The offense was carried out in a dispassionate and calculated manner.... Previous record: You have a record of violence or assaultive behavior, an escalating pattern of criminal conduct and/or violence, a persistent pattern of tumultuous relationships and criminal behavior which commenced at an early age,,,, Institutional behavior: You've programmed in a limited manner while incarcerated.... The psychiatric factors: The psychological report dated 6/16/94, authored by Dr. M.E. Roudebush — and briefly, in this report Dr. Roudebush says under conclusions, "While inmate Navarro is making a good institutional adjustment, he provides no basis for predicting that he would be able to make an acceptable adjustment in the free world."

Following its denial, the Board recommended that Petitioner:(1) Remain disciplinary free; (2) Upgrade vocationally and educationally; and (3) Participate in self-help and therapy programming.

In closing, Commissioner Guaderrama remarked upon Petitioner's silence in response to questions regarding his commitment offense, stating:

> You know, I'm just a little at loss to understand why your attitude is like it is here today. You don't sound like a man

23.

INSERT A

that wants to get out of prison. I'm not sure that's because
you feel comfortable here or you like prison. But like your
attorney said, you're going to have to convince the panel one
of these days that you're ready to go, get out on the outside
and be a free person. But until you start really become
convincing that that's what you want to do, it's not going
to happen. Because you've got to remember that you're a life
prisoner and you could stay here until you die. You know that's
a long time.

10.  Ninth Subsequent Parole Consideration Hearing – March 28, 1996

At Petitioner's tenth overall hearing, the Board had before it evidence

of his exceptional work reports, his participation in AA and NA, and his

disciplinary free behavior. Despite Petitioner's showing, the board denied

parole, stating:

> The reasons are, number one, the very violent type of crime
> committed, a crime committed during the course of an attempted
> robbery, His prior criminal record began at an early age....
> The third reason insufficient programming in the institution.
> We commend the prisoner for upgrading in the vocational area.
> We note that he has had six 115's since he's been incarcerated,
> the last being on 11/30/90 for disobeying orders. We also note
> that he has upgraded in the self-help area and participated
> in the self-help arena, particularly AA. And his work reports
> are good. The board report by CCI Jeppeson, dated March of
> 1995 states the prisoner would pose a moderate degree of threat
> to society if released.

In closing, Presiding Commissioner Koenig warned Petitioner about

asserting his right to remain silent on the issue of his commitment offense,

declaring:

> Just one word, I know you did the same thing last time, but
> we could conduct hearings without the prisoner simply by going
> through the records in the file, but society feels it's
> important that the panel meet with the prisoner and talk with
> the prisoner and get his feelings about the crime and remorse
> ad et cetera, that's how we come to a conclusion. It's too
> bad that you don't participate in the hearings. I just want
> to advise you that that's your right, also you don't have to
> come to a hearing period, you don't have to come here and sit
> if you don't want to. I would advise you in the future that
> you do participate in the hearing, but I know other panels
> have advised you of this also. So you're really only hurting
> yourself. Okay.

24.

INSERT A

11. Tenth Subsequent Parole Consideration Hearing - June 17, 1998

Petitioner attended his eleventh hearing on June 17, 1998. At the hearing, Petitioner presented the Board with eight years of disciplinary-free behavior and exceptional work reports and self-help programming.

After considering the overwhelming evidence of suitability, the Board denied parole. In its decision, the Board stated:

> The first reason is the commitment offense which was carried out in a manner that shows no regard for the suffering of other people.... We find our second reason is your previous history. You had a very unstable social history and an early involvement with drugs.... We find our third reason is in prison you've been (sic) some things real well. You've been disciplinary-free for the past eight years, you've upgraded vocationally, and you've, but you've done something that has not been good and that's that you've gotten out of NA, and you've just got to make that a life time commitment to follow through with that and learn the 12 steps.

At the conclusion of the hearing, the Board recommended that Petitioner, "remain disciplinary free, that [he] continue upgrading as you can vocationally and educationally, that [he] participate in self-help and any available therapy. Presiding Commissioner Bently ended the hearing by stating, "I'd really like to encourage you to consider for your next hearing, is to talk to us about the crime. Tell us what your role was in it, because it's not clearly not clear to us in the reports and it will help us understand you a little bit better in determining whether you've got, gained any insight."

12. Eleventh Subsequent Parole Consideration Hearing - February 27, 2001

On February 27, 2001, Petitioner attended his twelfth hearing. At the hearing, the Board considered Petitioner's disciplinary free behavior for over a decade, his completion of two vocations, his exceptional work reports, and laudatory chronos for his NA participation. In denying parole for one year, the Board listed its reasons, stating:

25.

INSERT A

> Many factors were considered. First and foremost was the
> commitment offense itself. This offense was carried out in a
> cruel manner, a manner -- a manner which demonstrates a callous
> disregard for human suffering. And it was also carried out in
> a calculated manner, a vicious and violent manner.... Regarding
> the inmate's criminal history, the prisoner has, on previous
> occasions, inflicted or attempted to inflict serious injury
> on a victim.... He was -- he has a history of unstable and
> tumultuous relationships. I'm referring to his emerging in the
> drug lifestyle and his relationships with his -- with what I
> would consider gangs, his peers in his neighborhood. He denies
> there was a gang relationship. I disagree.... In regards to
> his institutional behavior, the inmate has programmed fairly
> well, but this Panel feels he has not sufficiently participated
> in beneficial self-help and therapy programming.... And as far
> as the psychiatric factors go... [the most recent report] is
> not totally supportive.

The Board recommended that Petitioner, "remain disciplinary-free and

when available, participate in any and all self-help therapy," for his future

parole suitability.

### 13. Twelfth Subsequent Parole Consideration Hearing - April 24, 2002

Petitioner, again, substantially complied with the Board's

recommendations - remaining disciplinary-free and attending his NA meetings

regularly. Despite the showing of compliance at his thirteenth hearing, the

Board, again, found him unsuitable for parole, finding that he would "pose

and unreasonable risk of danger to society or a threat to public safety if

released from prison." In its decision, the Board again relied primarily

upon the commitment offense, explaining:

> Number one, the committing offense. The offense was carried
> out in an especially cruel and callous manner. The offense
> was carried out in [a] manner which demonstrates an
> exceptionally callous disregard for human suffering.

The Board cited additional factors of unsuitability in support of its

decision, including: previous record, institutional behavior, and insufficient

parole plans. Further, the Board suggested:

> That the prisoner still needs therapy in order to face, discuss,
> understand, and cope with stress in a nondestructive manner.
> Until then -- The prisoner can (indiscernible) understand the

26.

INSERT A

> causative factors of why the prisoner is here today. Until
> progress is made the prisoner continues to be unpredictable
> and a threat to others. Therapy in a controlled setting is
> needed but motivation or amenability are questionable.

The Board made the following recommendations: (1) Remain disciplinary

free; (2) If available, participate in beneficial self-help and therapy

programming; and (3) Verify parole plans.

In closing, Presiding Commissioner Moore admonished Petitioner, warning:

> The other point to you, Mr. Navarro, is that don't waste your
> time or mine. If [you] know that you are not ready because
> you haven't done the work, then don't waste people's time.
> Don't waste your time, don't waste your counselor's time, don't
> waste the Board's time.

The Board denied parole for two years.

14. **Thirteenth Subsequent Parole Consideration Hearing – August 24, 2004**

At his fourteenth hearing, the Board requested a one-year postponement

in order to obtain an updated psyche report for petitioner.

15. **Fourteenth Subsequent Parole Consideration Hearing – June 30, 2005**

On June 30 2005, Petitioner attended his fifteenth parole consideration

hearing. At the very beginning of the hearing, Presiding Commissioner Lee

admonished petitioner about exerting his right to remain silent regarding

the commitment offense, stating:

> Alright. Mr. Navarro, the law says very clearly you are not
> required to admit the crime. Do you understand that and I
> understand that.... However, I will indicate to you that you
> know in the Board packet there is evidence against you and
> you have no version every (sic) you were originally arrest[ed]
> you have never indicated your version of the story. My personal
> belief having been a prosecutor as well as sitting on the
> bench and being a defense counsel it looks like you're covering
> somebody and it's probably your brother who was found with
> the knife and (indiscernible). And that you feel a
> responsibility toward him and that over these years you have
> kept that responsibility and you don't want to lay it off
> on him. Something of that nature. Having said that, I will
> indicate to you that that will be problematic, that there
> is only one version and that version puts you in a very poor
> light. So having said that are we ready to proceed?.... Are
> you sure you don't want me to recuse myself right now?

27.

INSERT A

Petitioner declined Presiding Commissioner Lee's offer to recuse himself,

and the Board proceeded with the hearing. During the course of the hearing,

the Board considered Petitioner's disciplinary free behavior for a period

of over 15 years, his exceptional work report, his positive psychological

evaluation and counselor reports, his vocational and educational upgrading,

and his ongoing participation in NA. In sum the Board considered the

overwhelming evidence of suitability, but chose to deny parole once again.

In its decision the Board found:

> The offense was carried out in a cruel and callous manner,
> (indiscernible) inexplicable and very trivial in relationship
> to the offense. It is very clear that the facts of the case
> the inmate was involved in a robbery of an individual who
> ended up dying (indiscernible) is because of that particular
> case, that robbery is a dangerous enterprise and that
> individuals do get injured or killed ant that no one is excused
> from their activities even though they were not the actual
> (indiscernible) did not intend to kill someone. However, I
> will note the following. Mr. Navarro, (indiscernible) to pay
> attention to me. I went over the facts of this case. The facts
> of the case are very unique. The witnesses there were [two]
> individuals who approached the victim. One individual who
> approached the victim. One individual had a knife, the other
> individual later struck the person in the head. Neither of
> those individuals was you. Also, immediately after the offense
> they went and attempted to rob another individual by the name
> of Mr. Silva. That individual identified two individuals that
> was not you. The other reason for the denial, and maybe the
> District Attorneys in the past review factual, actual scenarios
> and actually look into the case. How your brother, Andy, got
> a second degree murder I do not know in light of the individual
> with the pipe and you ended up with a first degree murder.

The Board, secondarily, cited the other factors of Petitioner's previous

record, and the Tulare County District Attorney and Farmersville police

department opposition.

In closing, Presiding Commissioner Lee explained the multiple year

denial, stating:

> In a separate decision, this Panel finds that it is not
> reasonable to expect parole would be granted in the next two
> years. Most of your denials have been two years. There's no
> difference in this Board, this time. One year would give you

INSERT A

> false hope.... The reason for the two year denial is the
> multiple victims were attacked (indiscernible) defense though
> as I indicated it appears that you were not involved in it
> in some way....

The Board close the hearing, recommending that Petitioner, "remain[]

disciplinary free, continue to upgrade vocationally and educationally if

possible, participate in self-help and therapy programming (indiscernible).

16. Fifteenth Subsequent Parole Consideration Hearing – July 24, 2007

On July 24, 2007, Petitioner attended his sixteenth parole consideration

hearing. Despite the evidence of complying with the Board's recommendations

when he received a two year denial in 2005, the Board denied petitioner

parole for three years. There is no evidence that indicates that Petitioner

needs to show insight and remorse in order to be found suitable. Petitioner's

psychological evaluations do not support the Board's conclusion.

All the above information was available in Petitioner's Central-File

and before the Board in 2007, but the Board ignored it.

H.   The Board's Use Of The District Attorney's Opposition Of Parole
As Evidence To Deny Parole Violates Due Process.

In Hayward v. Marshall, (2008) DJDAR 93, the Ninth Circuit Court of

Appeal stated that "Even though the district attorney is permitted to attend

parole hearings and express an opinion on the prisoner's suitability for

parole, see Cal. Penal Code § 3041.7 (providing that prosecutor may be

present at a parole hearing 'to represent the interest of the people'),

the district attorney's opinion, without more, cannot be considered 'some

evidence' under Hill that supports the Governor's reversal of parole.

Rosenkrantz v. Marshall, 44 F. Supp.2d 1063, 1080 n. 14 (C.D. Cal. 2006).

(Id. at n. 9.)

I. There Is No Evidence Of A Previous Record Of Violence And The Board's
Reliance On Pre-Commitment Behavior To Deny Parole Violates The State And
Federal Constitution Due Process Clauses.

INSERT A

In its decision, the Board also cited Petitioner's "previous record," as a factor of unsuitability supporting denial of parole. Under the regulations, the fact that a prisoner has a previous record of violence, or that "[t]he prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated assaultive behavior at an early age," tends to indicate that he is unsuitable for parole. 15-CCR § 2281(c)(2). Accordingly, evidence that a prisoner "lacks any significant history of violent crime" tends to indicate suitability. 15-CCR § 2281(d)(6). The Board does not use the precise phrasing of the regulations, but it clearly uses the general language of the regulations to indicate a factor of unsuitability. There is simply no evidence to support the Board's finding.

While Petitioner has a prior record of convictions, only one of the convictions involved violence (assault with a deadly weapon), and one of the convictions constituted serious offenses. The Board emphasized the assault with a deadly weapon charge from 1972, as it was the only prior conviction involving violence, however Petitioner did not receive any prison time for this offense. Indeed, Petitioner was granted probation based on the assault offense, indicating that it was not particularly serious. Moreover, it is unreasonable to conclude that Petitioner's criminal history sets forth an "escalating pattern of criminal conduct," as the last five offenses leading up to the commitment offense were petty offense, the most recent conviction being possession of an open container (in an automobile).

Thus, in asserting future dangerousness, Petitioner's convictions related to his substance abuse provide no reasonable relationship to the commitment offense such that they indicate an "escalating pattern" of violence. Common sense and professional opinion in the record contradict the Board's finding.

INSERT A

The Board's reliance on Petitioner's past offense as escalating a pattern of significant violence and a factor of unsuitability is unreasonable.

Denial of parole where there are no circumstances that could be considered more violent or aggravated than the minimum necessary to sustain a conviction for that offense "would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public....' (Pen. Code, § 3041, subd. (a).) 'The Board's [and the Governor's] authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted.'" (In re Rosenkrantz, supra, 29 Cal.4th 616, 683.)

In this instance, the Board has denied parole sixteen times based upon the same reasoning and unchangeable factors. To remand for reconsideration to the Board would "amount to an idle act." (In re Scott, supra, 133 Cal.App.4th 573, 603; see also In re Smith (2003) 109 Cal.App.4th 489, 507.

For the foregoing reasons, the Court should reverse the Board's decision and order that the Board release petitioner immediately and discharged from parole. 15 CCR § 2345.

INSERT B

### Ground 2

THE BOARD OF PAROLE HEARING'S THREE-YEAR DENIAL WAS NOT WARRANTED
OR SUPPORTED BY "SOME EVIDENCE" AND THEREFORE ARBITRARY AND
CAPRICIOUS IN VIOLATION OF STATE AND FEDERAL DUE PROCESS.

On July 27, 2007, the Board of Parole Hearings issued a three-year denial of parole to Lionel Navarro ("Petitioner"). To do so was arbitrary. Generally, if the Board finds an inmate unsuitable for parole it must conduct subsequent parole consideration hearings annually. See Penal Code § 3041.5(b)(2). One exception relevant here is that if an inmate has been convicted of murder, the hearing may be deferred for "up to five years" if the Board "finds that it is not reasonable that parole would be granted at a hearing during th[ose] years." See Penal Code § 3041.5(b)(2)(B). The Board's decision to defer the annual hearing is guided by the same criteria used to determine parole suitability. See 15 CCR § 2270(d), citing 15 CCR § 2402.

In an unpublished decision (referred to herein because of its unique relevance to the instant Petition) the Court of Appeals held that an inmate should not receive a multi-year denial when the grounds for unsuitability — namely, limited insight into the instant offense — could not be cured within one year. See In re Lozano 2007 WL 117709. As applied to Petitioner, any alleged defects in his parole suitability — such as needing additional time for therapy or rehabilitative programming — could be easily accomplished via additional insight within one year. For Petitioner in the instant case, a three year denial by the Board was arbitrary and capricious given that: (a) Courts have previously reasoned that the recent timing of additional insight should not be of relevance in determining parole suitability (In re Lee, supra.); (b) the prison psychologist did not suggest the need for additional therapy as being pivotal to Petitioner's risk to society; and (3) Petitioner's in-custody history does not demonstrate impulse control issues, assaultive behavior, or other criminal proclivities which would indicate a need for long-

32.

INSERT B

term therapy.

California case law provides that the decision to defer a parole hearing longer than one year "may involved some of the same facts on which the unsuitability determination is based. What is required ... is an identification of reasons which justify the postponement," and a recognition that the Board is making a separate decision. In re Jackson (1983) 39 Cal.3d 464, 479; see also People v. Belmontes (1983) 34 Cal.3d 335, 347-348.

The Board not only erred in denying parole but in issuing a multi-year denial of three years because Petitioner's case for parole (from his previous hearing of 2003 and 2005) had improved, not worsened, despite the Board's issuance of a three year denial. In fact, since his previous parole denials of two years in 2005 and one years in 2004, two years in 2002, one year in 2001, two years in 1998, two year in 1996, two year denial in 1994, two years in 1992, two years in 1990, one year in 1989, one year in 1988, one year in 1987, one year in 1986, one year in 1985, and two years in 1983, the initial parole consideration hearing. Petitioner had continued to remain disciplinary free since 1990; had maintained his classification score to 19 (the established minimum); had participated in additional self-help programs including: Necrotic Anonymous issued a three-year denial while failing to discuss why a longer period of denial was warranted.

California courts have recently scrutinized the practice of issuing multi-year denials after single year denials when inmates' parole have improved as indicative of pro forma consideration meant to address the Board's large backlog problem by reducing the number of annual hearings rather than giving the required individualized consideration required at such hearings. In re Rutherford, Case No. SC135399, CAL. No. A114357 (Marin County Superior Court)(pending appeal). In In re Rutherford, which is styled as a class action,

33.

INSERT B

the Marin County Superior Court prescribed remedies and scheduling requirements to eliminate the 3,000 plus cases of late parole hearings by setting limits on the circumstances under which a panel could issue a multi-year denial. (See Exhibit 2, attached hereto, wherein the Marin County Court observed, "Respondents are ordered not to deny further parole consideration for more than one year in the case of prisoners who have formally denied for one year, in the absence of a significant change in circumstances, which must be stated on the record.")Given this strong directive of the Marin County Superior Court in a class action and the above authorities, it is notably suspect that Petitioner was given a multi-year denial after without explanation as to any alleged changed in circumstances.

As previously pointed out, the Board must do more than merely commend Petitioner for his programmatic achievements while in prison. They must actually consider these factors "as circumstances tending to show suitability for parole." Ramirez, (2001) 94 Cal.App.4th 571-72.

Furthermore, there is nothing in the entire record of numerous psychological evaluations to suggest that Petitioner needs additional time for self-help or therapy. To the contrary, Petitioner's most recent psychiatric evaluation found that, his "propensity for future violence" is in the "low range." (TR 31.) Under California law, Ramirez, supra, at 571-572 the Board cannot ask for anger management when this requirement or suggestion is not supported by the psychiatric reports. Ramirez found, "The Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's finding with deep suspicion." The same may be said in Petitioner's case when the Board calls for three years of additional self-help when none is mandated by the person's own psychiatrist or evidence by

INSERT B

Petitioner's in-custody history.

It should be noted that just last month, it was made public that Robert "Bobby" Rodriguez, a veteran employee of the BPH who supervises more than 100 deputy commissioners who make decisions on tens of thousands of parole revocation cases every year, was arrested for driving under the influence at twice the legal limit. In the state owned vehicle with Mr. Rodriguez, was John Monday, the executive director of the parole board, who was a passenger was believed to also have been intoxicated. (http://www.latimes.com/news/local/la-me-parole8dec08,15986773.story?coll=la-headlines-california&ctrack=1&cset=true.) While Mr. Monday and Mr. Rodriguez were fortunate nobody was hurt or killed as their car veered into the incoming traffic lane, it puts into perspective how dangerous alcohol abuse can be and how wrong choices can be made by even those who condemn such behavior as reason to deny parole, but how one can still overcome that problem, bad choices, and function in society without an unreasonable risk to public safety. Mr. Monday and Mr. Rodriguez are still on the job overseeing the parole process today, without the safeguards the parole board places on Petitioner, or others similarly situated. It is hoped Mr. Rodriguez and Mr. Monday will rise to their alcohol problem in a positive manner as demonstrated by Petitioner.

In conclusion, this Court should order Petitioner released from prison. Petitioner is a reformed man who has addressed the issues that resulted in his incarceration, with an impeccable record of prison behavior who has much to contribute to society. He has now been in prison for over twenty-three years longer than his minimum eligible release date of May 15, 1984. The BPH's abuse of discretion, which it committed by failing to consider all of the evidence in support of paroling Petitioner - empowered this Court to overrule the BPH and order his release.

INSERT C

## Ground 3

THE CALIFORNIA BOARD OF PAROLE HEARINGS VIOLATED
PETITIONER'S STATE AND FEDERAL DUE PROCESS WHEN IT
CONTINUE TO RELY ON THE 30 YEAR OLD COMITTMENT OFFENSE
TO DENY PAROLE, DESPITE PETITIONER'S DISCIPLINARY FREE
RECORD OF OVER 15 YEARS WITH NO RECORD OF VIOLENCE
THROUGHTOUT HIS ENTIRE INCARCERATION.

The commitment offense no longer supplies any evidence that petitioner posed a

danger to public safety. The board failed to articulate a nexus between Petitioner's thirty

(30) year old commitment offense and current dangerousness. Petitioner asserts that the

panel of July 27, 2007, violated his state and federal due process rights by failing: to set

his term in accordance with Penal Code Section 3041, et seq; by engaging in an arbitrary

and unconstitutional determination that his crime was particularly egregious; by failing to

adduce any evidence that was probative of a finding that he is currently dangerous; by

failing to find him suitable for parole in accordance with the Board Regulations set forth

in sections 2280-2343 of the California Code of Regulations; and by violating the due

process requires by applicable case law. Petitioner also maintains that there was **no**

**evidence**, niether "some" or the Board's standard of a "preponderance of the evidence,"

underlying the "reasons" the Board articulated for finding him unsuitable for parole and

more importantly NO EVIDENCE that he is currently dangerous.

The panel's weighty and unreasonable reliance on unalterable factors including

the crime itself violate his due process rights. The Board has in effect resentenced

petitioner from a term of seven (7) years to life, to life without the possibility of parole.

(See Cal. Penal Code section 190.2.)

Petitioner was denied parole, for the sixteenth time, based on the gravity of the

commitment crime, the circumstances of which can never change. Therefore, the Board's

continued sole reliance on the commitment offense will essentially convert petitioner's

INSERT C

sentence of life with the possibility of parole into a sentence of life without the possibility of parole.

"[T]he measure of atrociousness is not general notions of common decency or social norms for by that yardstick all murders are atrocious." In re Lee (2006) 143 Cal. App. 4th 1400, 1401. Viewed under the appropriate guidelines, petitioner's crime does not qualify as unusually calculated, cruel or callous. He did not taunt the victim or gloat over his distress. See People v. Misa (2006) 140 Cal. App.4th 937. 842-843.

The California Court of Appeal in In re Elkins (2006) 144 Cal. App. 4th discussed the use of the gravity of the commitment offense to support a denial of parole:

"Scott II summarizes the law in this situation. 'The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is correct [citation], but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence').

Reliance on such an immutable factor 'without regard or consideration of subsequent circumstance' may be unfair [citation], and runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation. [Citation]

The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time.

37

INSERT C

Thus, denial of release based solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." (Scott II, supra, 133 Cal App. 4th at pp 594-595, fns. omitted.)

The Court of Appeal stated "it violates due process to deny parole "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (Scott II, supra, 133 Cal. App 4th at p. 598)..."

The Court of Appeal, in Elkins, also observed: "We also take into account that whatever facts make a given offense aggravated or mitigated, compared to the hypothetical average are not overlooked or disregarded when the Board sets a release date...A release date is set by a calculation under matrixes Section 2403, subds. (b)-(f) that require the Board to weigh myriad facts of the offense that might be aggravating (Section 2404) or mitigating (Section 2405), including any factors that would have been considered by a judge in choosing a determinate sentence...Thus [the Board]...must remain focused not on circumstances that may be aggravating in the abstract but, rather, on facts indicating release currently poses "an unreasonable risk of danger to society." (Section 2402, subd. (a); accord, Pen. Code, Section 3041, subd. (b))."

The Board's reliance on Petitioner's commitment offense, which took place 25 years ago to deny parole, was unreasonable. A plethora of recently issued California state and federal district court decisions uniformly holds that evidence of even particularly egregious facts of commitment offenses is not tantamount to evidence of undue current parole risk absent articulation of a nexus between those entities. Willis v. Kane, 485 F. Supp. 2d 1126, 1135 (N.D. Cal. 2007) ["Notwithstanding the terrible nature of the crime,

INSERT C

the critical question the BPH was supposed to decide at the parole suitability hearing was

whether 'consideration of the public safety requires a more lengthy period of

incarceration for this individual'…Willis' 1983 crime did not provide sufficient evidence

to find him unsuitable for parole in 2003."] Martin v. Marshall, 431 F. Supp. 2d 1038,

1049 (N.D. Cal. 2006);

Blankenship v. Kane, 2007 WL 1113798 at *10 (N.D. Cal. 2007) ["…the California

regulations require…some evidence that the prisoner poses a present danger to

society…continued reliance over time on an unchanging factor…the commitment

offense…does not provide evidence of a present danger to society"]; Thomas v. Brown,

2006 WL 3783535 at *6 (N.D. Cal. 2006]; Rosenkrantz v. Marshall, 444 F. Supp 3d.

1963, 1086 (C.D. Cal. 2006)

The Board's determination that petitioner's crime was especially cruel or egregious is

unconstitutionally vague and standard less. See United States v. Doremus (9th Cir. 1989)

888 F. 2d 630, 634.

The Board relies on any fact of the crime to bolster its conclusion that the crime is

particularly egregious. The Board makes a determination that virtually ALL life crimes

are particularly egregious.

The Board's characterization of petitioner's crime as exceptional was arbitrary since

the Board and governor routinely and invariably characterizes all offenses carrying life

terms as exceptional. Petitioner asks this Court to take judicial notice of the order in

**MIKE NGO On Habeas Corpus [Superior Court of Santa Clara, No. 127611,**

**August 30, 2007]** where the Honorable Linda Condron found comprehensive evidence

indicating that the state's Board of parole hearings completely disregards the detailed

INSERT C

standards and criteria of the parole release statute, 15 CCR Section 2402 (c) and thereby

denies prisoners' due process rights.

The Honorable Judge Condron found:

> "In summary, when every single inmate is denied parole because his or her crime
> qualifies as a Section 2402(c) (1) exception to the rule that a parole date shall normally be
> set, then the exception has clearly swallowed the rule and the rule is being illegally
> interpreted and applied.
> When every single life crime that the Board examines is "particularly egregious" and
> "especially heinous, atrocious or cruel" it is obvious that the Board is operating without
> any limits and with unfettered discretion."

Based on the arbitrary characterization of every murder as being exceptional, the

Board's decision denying parole for petitioner is per se invalid because he was denied his

constitutional right to be heard by an impartial decision-maker. See Withrow v. Larkin,

421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975) ("Not only is a biased decision

maker constitutionally unacceptable but "our system of law has always endeavored to

prevent even the probability of unfairness.")

When an inmate is found suitable for parole, the Board does not deem the crime as

particularly egregious. However, the governor when reviewing the Board's determination

may disagree and consider the crime as particularly egregious and deny parole. At a

subsequent hearing the Board may again classify the crime as particularly egregious.

The change in classification of the very same crime from being non-exceptional to

particularly egregious demonstrates the arbitrariness of the classification process itself.

The Board's use of uncharged and unproven elements of his crime to continue

denying parole violates petitioner's constitutional right to a jury trial. See Apprendi v.

New Jersey, 530 U.S. 466, 490.

INSERT C

There are no elements of Petitioner's commitment offense that exceed the minimum elements of the crime of first degree murder. (See In re Elkins, 144 Cal.App.4th 475 (2006).) No characteristics of Petitioner's crime indicate that he would pose an unreasonable threat to public safety if he were to be released on parole. No factors relating to Petitioner's prior and post-commitment conduct tend to show that he is not suitable to be released under the supervision of parole. Petitioner's lack of significant criminal history and his institutional behavior are circumstances which tend to show suitability in his particular case.

Murder, by its very nature is heinous, atrocious and cruel. For one to be found to be "especially heinous, atrocious and cruel," it must be presented to a jury (Cal. Penal Code § 190.2 (14) and § 190.4). Any murder is malicious and unlawful and justifies imprisonment and, under current law, sometimes more than imprisonment. However, certain fundamental principles applying to punishment and parole have been written into law and further articulated by the state and federal courts. These principals must be followed by the Board, however unpalatable or inconvenient they may be to the commissioners. As expressed by Justice Richman in In re Barker, 151 Cal.App.4th 346 (Cal. Ct. App. 2007), although murderous conduct cannot be excused or minimized, the system provides for parole in appropriate circumstances. If the prisoner has met the prerequisites for release, the prisoner must be released. Returning to precedent, Justice Richman wrote: "All murders represent the basest form of human behavior. Our laws, however, provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws. The record established that Lee does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support." Id. at 378 (quoting Lee, 143 Cal.App.4th at 1414) (footnote omitted).

Petitioner's record does not contain the factual basis needed to support an inference that he currently pose a risk to public safety, He must be released.

41

CONCLUSION

Petitioner Lionel Navarro has served a term equivalent to one had he been

Petitioner Lionel Navarro accepts responsibility for his crime and does not seek to minimize its impact. He choice not to talk about the commitment offense is based on Cal. Penal § 5011. The Board's decision finding Petitioner unsuitable for parole is not supported by some evidence and it is arbitrary. Because the Superior Court's adoption of that decision is contrary to, or involves an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, the Court should grant the Petition for Review.

Dated: July 12, 2008

Respectfully submitted

_Lionel Navarro_
Lionel Navarro
Petitioner in Pro Se

(b)  At arraignment and plea _____

(c)  At trial _____

(d)  At sentencing _____

(e)  On Appeal _____

(f)  In any post-conviction proceeding   Jennifer M. Sheetz, 38 Miller Ave., Mill Valley,
_CA 94941. This Court appointed Sua sponte._____

(g)  On appeal from any adverse ruling in a post-conviction proceeding _____

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time

Yes ☒  No ☐

17.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack:

Yes ☐  No ☒

(a)  If so, give name and location of court which imposed sentence to be served in the future: _____

(b)  Give date and length of the above sentence: _____

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes ☐  No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.  Executed

_July 12, 2008_
(date)

_Leonel Navarro_
Signature of Petitioner

(7)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:              )        CDC Number B-91886
                         )
LIONEL NAVARRO           )
_____  )

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

JULY 24, 2007

8:56 A.M.

PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
Deborah Star, Deputy Commissioner

OTHERS PRESENT:

Mike Gunning, Attorney for Inmate
Afreen Kaelble, Deputy District Attorney
Cynthia Smith, Observer
David Hymas, Observer
R.E. King, Observer
Correctional Officer(s), Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No    See Review of Hearing
_____  Yes   Transcript Memorandum

**GITA SCHMITZ**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**

EXHIBIT A

INMATE

INDEX

                                                              Page

Proceedings ................................................. 1

Case Factors .............................................. 11

Pre-Commitment Factors .................................. 17

Post-Commitment Factors ................................. 22

Parole Plans ............................................. 36

Closing Statements ...................................... 42

Recess .................................................... 52

Decision .................................................. 53

Adjournment .............................................. 62

Transcriber Certification ............................... 63

--oOo--

1

1          P R O C E E D I N G S

2          PRESIDING COMMISSIONER BRYSON:  This is the 15th

3    Subsequent Parole Consideration Hearing for Lionel

4    Navarro, CDC Number B-91886.  Today's date is July 24th,

5    2007, and the time is 8:56.  We're located at San Quentin

6    State Prison.  This inmate was received April 6th, 1978 in

7    Tulare County.  The life term began in April 6th, 1978

8    with a minimum eligible parole date of May 15th, 1984.

9    Charging in Case Number 18308, Count One and controlling

10   offense, Penal Code 187, Murder First; with Count Two,

11   Penal Code 664/211, Attempted Robbery, that's Robbery

12   Second (inaudible) the weapon, a metal pipe, for which the

13   inmate received a term of life.  This hearing is being

14   recorded.  For the purpose of voice identification, each

15   of us will state our first and last name, spelling the

16   last name.  When it is your turn, sir, after spelling your

17   last name, please state your CDC number.  I will start and

18   go to my left.  Sandra Bryson, B-R-Y-S-O-N, Commissioner,

19   Board of Parole Hearings.

20         DEPUTY COMMISSIONER STAR:  Debra Star, S-T-A-R,

21   Deputy Commissioner, Board of Parole Hearings.

22         DEPUTY DISTRICT ATTORNEY KAELBLE:  Afreen Kaelble,

23   Deputy District Attorney, K-A-E-L-B-L-E.

24         MS. SMITH:  Cynthia (phonetic) Smith, S-M-I-T-H,

25   viewing.

2

1          MR. HYMAS:  David Hymas, I'm an attorney in San

2    Francisco with Morrison and Foerster.   I'm observing.

3          PRESIDING COMMISSIONER BRYSON:  Please spell your

4    last name.

5          MR. HYMAS:  H-Y-M-A-S.

6          MR. KING:  R.E. King, K-I-N-G, I'm observing.

7          PRESIDING COMMISSIONER BRYSON:  Thank you.

8          ATTORNEY GUNNING:  Mike Gunning, G-U-N-N-I-N-G,

9    I'm the attorney for Mr. Navarro.

10          INMATE NAVARRO:  Inmate Navarro,

11    N-A-V-A double-R-O.  B-91886.

12          PRESIDING COMMISSIONER BRYSON:  Thank you.  And I

13    note for the record, we have two correctional peace

14    officers in the room who are here for security purposes.

15    And, sir, would you raise your right; I need to swear you

16    in.  Do you solemnly swear or affirm that the testimony

17    you give at this hearing will be the truth, the whole

18    truth, and nothing but the truth?

19          INMATE NAVARRO:  Yes, I do.

20          ATTORNEY GUNNING:  Can I ask a quick question?

21    What is the purpose of the observers here?

22          PRESIDING COMMISSIONER BRYSON:  They can identify

23    their source individually.

24          MR. HYMAS:  I'm an attorney and I represent

25    several inmates in life terms and so we arrange with

3

1    Sacramento just to observe lifer hearings.

2         ATTORNEY GUNNING:  Okay, all right.

3         MR. HYMAS:  We're not here on behalf of anybody.

4    These are two colleagues of mine that work with me.

5         ATTORNEY GUNNING:  All right, thank you.

6         PRESIDING COMMISSIONER BRYSON:  And they have been

7    approved through Sacramento.

8         ATTORNEY GUNNING:  Excellent.

9         PRESIDING COMMISSIONER BRYSON:  All right,

10   Commissioner Star, is there any confidential material in

11   the file and, if so, will it be used today?

12        DEPUTY COMMISSIONER STAR:  There is confidential

13   material in the file, however, we will not be using any of

14   it today.

15        PRESIDING COMMISSIONER BRYSON:  Thank you.  And

16   I've passed the Hearing Checklist marked Exhibit 1 to your

17   attorney, sir, and to the District Attorney to be sure

18   that we're all proceeding with the same set of documents

19   and, Mr. Gunning, do you have it all?

20        ATTORNEY GUNNING:  I do, thank you.

21        PRESIDING COMMISSIONER BRYSON:  And, Ms. Kaelble,

22   do you have it all?

23        DEPUTY DISTRICT ATTORNEY KAELBLE:  The only thing

24   I'm not sure about with regards to support letters, I

25   don't have any current letters as to this inmate.

4

1        PRESIDING COMMISSIONER BRYSON:  Thank you, and I
2    do not believe that we have any on file at this point.
3    And are there are any additional documents?
4        ATTORNEY GUNNING:  I just have one.  This is a
5    recent Anger Management chrono.
6        DEPUTY COMMISSIONER STAR:  Okay.  I'll be
7    reviewing that --
8        ATTORNEY GUNNING:  Thank you.
9        DEPUTY COMMISSIONER STAR:  -- at the appropriate
10    time.
11        PRESIDING COMMISSIONER BRYSON:  Sir, please read
12    the document in front of you there aloud.
13        INMATE NAVARRO:  The ADA Statement:
14        "The Americans with Disabilities Act, ADA, is
15        a law to help people with disabilities.
16        Disabilities are problems that can make it
17        harder for some people to see, hear, breathe,
18        talk, walk, for them to think or to take care
19        of themselves than it is for others.  Nobody
20        can be kept out of public places or
21        activities because of a disability.  If you
22        have a disability, you have the right to ask
23        for help to get ready for the BPT Hearings,
24        to get to the hearing, talk, read forms and
25        papers, and understand the hearing process.

5

```
 1            BPT will look at what you ask for to make
 2            sure that you have a disability that is
 3            covered by the ADA and that you have asked
 4            for the right kind of help.  If you do not
 5            get help or you don't think you got the kind
 6            of help you need, ask for a BPT 1074
 7            Grievance Form.  You can also get help to
 8            fill it out."
 9         PRESIDING COMMISSIONER BRYSON:  Well, thank you,
10    sir.  Do you understand what you read?
11         INMATE NAVARRO:  Yes.
12         PRESIDING COMMISSIONER BRYSON:  All right.  The
13    record will reflect that, on March 15th, 2007, a signed
14    BPT Form 1073, the Reasonable Accommodation Notice and
15    Request in accordance with the provisions of the Americans
16    with Disabilities Act, disabilities defined under the ADA.
17    This shows you as you having no disabilities identified
18    from the file review.  You have a reading level of 8.5,
19    which is good.  There's no given GPA, but you do have a
20    GED which you apparently achieved on April 14th of 1987;
21    is that correct?
22         INMATE NAVARRO:  Yes.
23         PRESIDING COMMISSIONER BRYSON:  All right.  And
24    you do not wear glasses; is that correct?
25         INMATE NAVARRO:  Yes, I do, but they're near-
```

1    sighted.

2              PRESIDING COMMISSIONER BRYSON:  Oh, I see.  So do

3    you use them for reading then?

4              INMATE NAVARRO:  No.

5              PRESIDING COMMISSIONER BRYSON:  So you use them to

6    see distances?

7              INMATE NAVARRO:  Yes.

8              PRESIDING COMMISSIONER BRYSON:  I understand.  And

9    do they suffice?  Do they accommodate you for seeing?

10             INMATE NAVARRO:  Yes.

11             PRESIDING COMMISSIONER BRYSON:  Okay, thank you.

12   You don't appear to have any hearing difficulties; is that

13   correct?

14             INMATE NAVARRO:  No.

15             PRESIDING COMMISSIONER BRYSON:  Okay, and you

16   didn't appear to have any mobility issues getting into the

17   hearing room; is that correct?

18             INMATE NAVARRO:  No.

19             PRESIDING COMMISSIONER BRYSON:  All right.  Have

20   you ever been involved in Triple CMS or EOP Programs?

21             INMATE NAVARRO:  No.

22             PRESIDING COMMISSIONER BRYSON:  Have you ever been

23   on psychotropic medications, either in prison or in the

24   street?

25             INMATE NAVARRO:  No.

7

1        PRESIDING COMMISSIONER BRYSON:  All right, do you

2    suffer from any disabilities that might prevent you from

3    participating in today's hearing?

4        INMATE NAVARRO:  No.

5        PRESIDING COMMISSIONER BRYSON:  And, Counsel, do

6    you concur?

7        ATTORNEY GUNNING:  I do, thank you.

8        PRESIDING COMMISSIONER BRYSON:  This hearing is

9    being conducted pursuant to Penal Code Sections 3041 and

10   3042 and the rules and regulations of the Board of Parole

11   Hearings governing parole consideration hearings for life

12   inmates.  The purpose of today's hearing is to consider

13   your suitability for parole.  In doing so, the Panel will

14   consider the number and nature of the crimes for which you

15   were committed, your prior criminal and social history,

16   and your behavior and programming since your commitment.

17   The Panel has had the opportunity to review your Central

18   File.  You will be given the opportunity to correct or

19   clarify the record.  The Panel will consider your progress

20   since your commitment, your counselor's report,

21   psychological report, and any other relevant information.

22   Any change in parole plans should be brought to the

23   Panel's attention.  The Panel will reach a decision today

24   and inform you whether or not it finds you suitable for

25   parole and the reason for its decision.  If you're found

8

1    suitable for parole, the length of your confinement will

2    be explained to you.  Nothing that happens here today will

3    change the findings of the court.  The Panel is not here

4    to retry your case.  The Panel is here for the sole

5    purpose of determining your suitability for parole.  Do

6    you understand?

7            INMATE NAVARRO:  Yes.

8            PRESIDING COMMISSIONER BRYSON:  This hearing will

9    be conducted in three phases.  I will discuss with you the

10   crime for which you were committed, your prior criminal

11   and social history.  Commissioner Star will discuss with

12   you your progress since your commitment, your counselor's

13   report, and your psychological evaluation.  I will then

14   discuss with you your parole plans and any letters in

15   support or opposition that may be in the file.  Once that

16   is concluded, the Panel, and then the District Attorney,

17   and then your attorney will be given the opportunity to

18   ask you questions.  The questions from the District

19   Attorney shall be asked through the Chair and you will

20   direct your answers to the Panel.  Next the District

21   Attorney and then your attorney and then you will be given

22   an opportunity to make a final statement regarding your

23   parole suitability.  Your statement should address why you

24   feel you are suitable for parole.  The Panel will then

25   recess, clear the room, and deliberate.  Once the

1    deliberations are completed, the Panel will resume the

2    hearing and announce its decision.  The California Code of

3    Regulations states that regardless of time served, a life

4    inmate shall be found unsuitable for and denied parole if,

5    in the judgment of the Panel, the inmate would pose an

6    unreasonable risk of danger to society if released from

7    prison.  You have certain rights.  Those rights include

8    the right to a timely notice of this hearing.  Were you

9    given timely notice of this hearing?

10    INMATE NAVARRO:  Yes.

11    PRESIDING COMMISSIONER BRYSON:  The right to

12    review your Central File.  I don't see that you did review

13    your Central File recently.  Were you given an opportunity

14    to review it?

15    INMATE NAVARRO:  Yes.

16    PRESIDING COMMISSIONER BRYSON:  And did you

17    decline?

18    INMATE NAVARRO:  Yes.

19    PRESIDING COMMISSIONER BRYSON:  Okay, and why is

20    that?

21    INMATE NAVARRO:  I don't even know what's in

22    there.

23    PRESIDING COMMISSIONER BRYSON:  Okay.  I'll give

24    you the same I give to all the inmates, which is that it's

25    a good thing to do.  Your whole life is in that pile of

10

1    paper and things could get lost and you may have things
2    you want to put in there, so I would recommend it.   You
3    also have the right to be heard by an impartial Panel.  Do
4    you have any evidence that the Panel before you would not
5    be impartial?

6            INMATE NAVARRO:   No.

7            PRESIDING COMMISSIONER BRYSON:   You'll receive a
8    copy of the Panel's written tentative decision today.
9    That decision will become effective within 120 days.   It
10   is also subject to review by the Governor.   The copy of
11   the tentative decision and a copy of the transcript will
12   be sent to you.   The Board has eliminated its appeal
13   process.   If you disagree with anything in today's
14   hearing, you have the right to go directly to the court to
15   complain.   You are not required to admit your offense or
16   discuss your offense if you do not wish to do so.
17   However, this Panel does accept as true the findings of
18   the court and you're invited to discuss the facts and
19   circumstances of the offense.   The Board will review and
20   consider any prior statements you've made regarding the
21   offense in determining your suitability for parole.   So
22   basically, it's very simple, just tell the truth.
23   Counsel, are there any preliminary objections?

24           ATTORNEY GUNNING:   I have none, thanks.

25           PRESIDING COMMISSIONER BRYSON:   Will this inmate

11

1    be speaking with the Panel?

2         **ATTORNEY GUNNING:**  He will not be discussing the

3    commitment offense, as far as the facts, nor will he be

4    discussing his prior arrest and/or conviction.

5         **PRESIDING COMMISSIONER BRYSON:**  I'm going to read

6    into the record the probation officer's report regarding

7    the commitment offense.  And this begins on Page 3 as to

8    circumstances:

9              "The defendant appeared in Tulare County

10             Superior Court on February 28th, 1978, and was

11             found guilty by a jury trial in a felony to

12             (inaudible) 187 of the California Penal Code,

13             Murder Count One in violation of Section

14             664/211.  That's California Penal Code

15             Attempted Robbery Count Two.  At that time,

16             the matter was referred to the Probation

17             Department for report and recommendation.  At

18             that time, the hearing was set for March 20th,

19             1978.  And as to the facts, on November 10th

20             of 1977, Farmersville Police Officer, while

21             on routine patrol was driving southbound on

22             North (inaudible) Avenue when he observed

23             three Mexican male subjects running westbound

24             across a vacant lot.  The officer identified

25             the subjects as being the defendant, Lionel

12

1    Navarro, and two codefendants, Andy Navarro

2    and Carlos Garcia.  The Farmersville police

3    officers had earlier contact with the subject

4    when they were involved in a disturbance at

5    the Siete De Copas Bar in Farmersville.  The

6    officer looked down the street from which the

7    subjects had run and notice a subject to be

8    lying in the middle of the road rolling on

9    his side.  After dispatching another officer

10   to investigate, the patrolman continued his

11   pursuit of the three possible suspects who

12   had by this time run into the Navarro

13   residence, which is located at 591 North

14   Little Street.  Back-up patrol units arrived

15   at the scene and a search of the area was

16   initiated.  Upon approaching the Navarro

17   residence, an officer observed the suspect,

18   whom he recognized as Andy Navarro, walking

19   along the side of the house approaching the

20   carport area.  It was noted by the officer

21   that Andy Navarro had what appeared to be

22   blood stains on the front of this white T-

23   shirt and was carrying what appeared to be a

24   brown-colored Pendleton shirt in his hands.

25   Upon seeing the officer, the defendant began

13

```
1          running to the rear of the yard of the
2          residence.  After several minutes of pursuit,
3          Andy Navarro was taken into custody.  During
4          the search of the area, officers went to the
5          approximate area where Andy Navarro had
6          jumped over the fence while being pursued.
7          At that location, they discovered a brown-
8          colored Pendleton shirt, two brown leather
9          wallets, and a check stub belonging to the
10         victim, later identified as Pasquale
11         Gonzales.  Wrapped inside his shirt was a
12         large hunting knife with a ten-inch blade and
13         bone handle.  Identification belonging to the
14         defendant was found in a second wallet.
15         Further investigation into the matter
16         revealed that the victim, Pasquale Gonzales,
17         had been attacked by the three previously
18         mentioned subjects and was seriously injured.
19         The purpose of the attack was determined to
20         be robbery.  A second robbery is reported to
21         have occurred near the attempted robbery of
22         Pasquale Gonzales.  The second robbery victim
23         being Marcello Silva.  It was later
24         determined that the defendant was not
25         involved in the robbery of Marcello Silva."
```

14

1    And moving to Page 5, the first full paragraph:

2          "In checking the crime scene, a metal pipe,

3          approximately three feet in length and of

4          small diameter, was found leaning against a

5          tree.  The pipe was confiscated as evidence."

6    I omitted a paragraph that I'm going to go ahead and read

7    on the second robbery:

8          "Later it was determined that while officers

9          were pursuing the suspects, Marcello Silva

10         had gone to the assistance of Pasquale

11         Gonzales who was lying on the ground on the

12         roadway.  Mr. Silva reportedly placed Mr.

13         Gonzales into the rear of his, Silva's,

14         vehicle and traveled to one of the

15         investigating officer's location on North

16         Little street.  Upon their arrival, the

17         officer observed that the victim, Pasquale

18         Gonzales, had partially coagulated blood on

19         the nose and mouth area.  A mucosa substance

20         was running from the corner of his mouth.

21         The victim appeared to be having a difficult

22         time breathing.  The victim's hands were

23         continually moving in a stroking manner from

24         his upper chest to the top of his head and

25         back.  His motions appeared to be out of

15

1          control.  The officer attempted to talk to

2          the victim, but he could not get a response.

3          While laying the victim down on his back,

4          the officer noted that the victim felt cold

5          to his touch and appeared to be in shock.

6          The left side of his, Pasquale Gonzales',

7          head towards the rear area was greatly

8          swollen as if he had received a blow to the

9          head.  Upon arrival of the ambulance, the

10         victim was transported to the Kaweah Delta

11         Hospital where he died several hours later.

12         A witness to the incident, Alicio Martinez,

13         reported to officers that he had observed

14         the defendant, Carlos Garcia and Andy

15         Navarro, confront the victim, Pasquale

16         Gonzales on the roadway near his home.

17         Mr. Martinez reportedly observed the three

18         subjects to surround the victim.  One of the

19         subjects is reported to have grabbed a hold

20         of the victim at which time it is reported

21         that Carlos Garcia struck the victim on the

22         head with what appeared to the witness to be

23         a stick.  After the victim had fallen to the

24         ground, defendants reported to have stood

25         over the victim.  The other two subjects,

```
 1              Andy Navarro and Carlos Garcia are reported
 2              to have then approached Marcello Silva and
 3              subsequently rob him at knifepoint.  At the
 4              culmination of the investigation, it was
 5              determined that the defendant, Andy Navarro
 6              and Carlos Garcia, were responsible for
 7              confronting Pasquale Gonzales for the
 8              purpose of robbery and that their attempts
 9              to effect said robbery resulted in the death
10              of Pasquale Gonzales.  As a result, all
11              three subjects were arrest and charged with
12              attempted robbery and murder."
13   Now, I noted that in all of the counselors' reports, this
14   inmate has basically refused to discuss the crime.  So
15   I'm going to read the defendant's statement that was in
16   the probation officer's report, which is the most current
17   statement, unless you have something further that you
18   wish to submit.
19              ATTORNEY GUNNING:  No, thank you.
20              PRESIDING COMMISSIONER BRYSON:  All right.
21              "The defendant was interviewed at the Tulare
22              County Jail on March 10th, 1978.  At the
23              request of the defendant's attorney, James
24              Oliver, the writer did not solicit a
25              statement from the defendant regarding the
```

17

1          incident offense.  The writer did advise the

2          defendant that Mr. Oliver did not want the

3          defendant to make a statement regarding the

4          incident offense and the defendant indicated

5          to the writer that he had nothing to say

6          anyway."

7     And through all the hearings that I was able to review,

8     the defendant, you, sir, have not talked about the crime,

9     which is your right.  I would like to ask you a question

10    and you also have a right not to answer this question, so

11    that will be up to you and your attorney.  Why have you

12    not spoken about this, sir?

13          INMATE NAVARRO:  I just prefer not to talk about

14    it.

15          PRESIDING COMMISSIONER BRYSON:  All right, sir.

16    And as to this inmate's history, his juvenile record, I

17    will just note this for the record by reading the

18    counselor's report, the most current comprehensive Board

19    Report that we do have, that is of January 2005, prepared

20    by M. Garcia, common spelling, Correctional Counselor I,

21    we note that Navarro's juvenile arrest history began in

22    May 1969 at the age of 15 for burglary.  He was made a

23    ward of the court as a result of the burglary charge.  Two

24    years later, he was placed on probation after an arrest

25    for public intoxication.  During the same year, Navarro

18

1    was arrested for failure to disperse, which placed him as

2    a ward of the court again.  As to adult convictions and

3    arrests, in 1972, Navarro was arrested and convicted for

4    possession of a switchblade.  Navarro was arrested twice

5    for public intoxication and drunk driving.  He served 25

6    days in jail on each occasion.  Navarro was also convicted

7    of assault with a deadly weapon where he served 240 days

8    in jail and was placed on two years' probation.  Navarro

9    was arrested in 1975 for possession of an open container

10   and being in a place where unlawful activity was

11   occurring.  He has no prior prison term.  As to personal

12   factors, Mr. Navarro, you were 23-years old at the time of

13   the crime and you are now 53; is that correct?

14        INMATE NAVARRO:  Yes.

15        PRESIDING COMMISSIONER BRYSON:  Okay.  Having

16   been born on January 28th of 1954, Tulare, California, to

17   Jose Navarro and Esperanza Navarro.  Your father's

18   whereabouts are unknown; is that true today?

19        INMATE NAVARRO:  He's deceased.

20        PRESIDING COMMISSIONER BRYSON:  He's deceased,

21   okay.  And your mother was left to raise ten children on

22   welfare, ages ranging from 14 to 30 years old.  You

23   received your GED, we've already mentioned.  You were not

24   in military and the POR indicates that prior to your

25   arrest, you were employed by Atlas, Incorporated Laundry

19

1   Services from January to April of 1977; is that correct?

2          INMATE NAVARRO:  Yes.

3          PRESIDING COMMISSIONER BRYSON:  Okay.  So did you

4   have a job at the time of the commitment offense?

5          INMATE NAVARRO:  No, ma'am.

6          PRESIDING COMMISSIONER BRYSON:  Why is that?

7          INMATE NAVARRO:  I was out running around using

8   drugs.

9          PRESIDING COMMISSIONER BRYSON:  I see.  When did

10  you start using drugs?

11         INMATE NAVARRO:  An early age.

12         PRESIDING COMMISSIONER BRYSON:  About how old?

13         INMATE NAVARRO:  About 13.

14         PRESIDING COMMISSIONER BRYSON:  How did you get

15  introduced to them?

16         INMATE NAVARRO:  I saw some guys using it and

17  tried it and like it.

18         PRESIDING COMMISSIONER BRYSON:  Were you involved

19  with any gangs as a youngster?

20         INMATE NAVARRO:  No, ma'am.

21         PRESIDING COMMISSIONER BRYSON:  Okay.  What

22  specific drugs were your favorites?

23         INMATE NAVARRO:  Heroin.

24         PRESIDING COMMISSIONER BRYSON:  Okay.  Any

25  others?

20

1           INMATE NAVARRO:  No, basically Heroin.

2           PRESIDING COMMISSIONER BRYSON:  Okay.  So over

3   the years, then, were you involved -- and up until the

4   commitment offense, did you traffic in Heroin as well as

5   use it?

6           INMATE NAVARRO:  Well, I sold and I, you know,

7   cleaned up once in a while.  And then I would work a

8   little bit and that's about it.

9           PRESIDING COMMISSIONER BRYSON:  You're a very

10  lucky man, you know, to be alive today.

11          INMATE NAVARRO:  I know.

12          PRESIDING COMMISSIONER BRYSON:  It's amazing.

13  Okay.  It says you're in good physical condition, no

14  medical problems.  That's really wonderful.  And it says

15  that you drank alcohol at the age of 18.  So did alcohol

16  then become also a factor?

17          INMATE NAVARRO:  Well, I would drink a beer here

18  and there when I was a kid to cover my drug use.

19          PRESIDING COMMISSIONER BRYSON:  I see.

20          INMATE NAVARRO:  So, you know, but I drank a

21  little, but not that much.

22          PRESIDING COMMISSIONER BRYSON:  So, do you

23  consider yourself an addict?

24          INMATE NAVARRO:  Yeah, I'm a recovering addict.

25          PRESIDING COMMISSIONER BRYSON:  Okay.  How about

21

 1   an alcoholic?

 2          INMATE NAVARRO:  Not really.

 3          PRESIDING COMMISSIONER BRYSON:  I will ask you

 4   this question and you can elect to answer it or not, but

 5   had you gone under the influence immediately prior to this

 6   crime?

 7          INMATE NAVARRO:  Yes, well, I was -- I needed

 8   money.

 9          PRESIDING COMMISSIONER BRYSON:  I see, for the

10   drug habit is --

11          INMATE NAVARRO:  Yes, ma'am.

12          PRESIDING COMMISSIONER BRYSON:  Okay.  So we

13   don't have much more on you.  In fact, nothing more, sir.

14   And I'd like to ask you, it must have been difficult for

15   your mother raising -- trying to raise children all by

16   herself; is that correct?

17          INMATE NAVARRO:  Yes.

18          PRESIDING COMMISSIONER BRYSON:  Did you have a

19   stepfather at any point?

20          INMATE NAVARRO:  No.

21          PRESIDING COMMISSIONER BRYSON:  So how would you

22   characterize your upbringing?  Did you get taught right

23   from wrong --

24          INMATE NAVARRO:  Yes, I was taught right from

25   wrong, I just chose wrong.

22

1          PRESIDING COMMISSIONER BRYSON:  I see.  Do you
2     keep in touch with your brothers and sisters?
3          INMATE NAVARRO:  Yes, I call them, I write.
4          PRESIDING COMMISSIONER BRYSON:  Okay.  Do they
5     come and visit you ever?
6          INMATE NAVARRO:  Once in a while.  I let them
7     bring my mom.
8          PRESIDING COMMISSIONER BRYSON:  How is she doing?
9          INMATE NAVARRO:  She's getting old.  I don't like
10    them to come and visit me here in prison too much.
11         PRESIDING COMMISSIONER BRYSON:  Well, sometimes
12    it helps them to be able to do something like this with
13    you.
14         INMATE NAVARRO:  Yeah.
15         PRESIDING COMMISSIONER BRYSON:  So maybe that's a
16    good thing.  Okay, well, if you'll turn attention now to
17    Commissioner Star, she'll talk about your post-conviction
18    factors.
19         DEPUTY COMMISSIONER STAR:  Okay, good morning,
20    Mr. Navarro.  Today I'll be referring to the correctional
21    counselor's report, as well as your Central File in
22    addressing your post-conviction factors.  I will be
23    focusing on your programming and activities since your
24    last hearing, which was held on June 30th of 2005, where
25    you received a two-year denial.  The Board Members at that

23

1    time recommended that you remain disciplinary free, that

2    you participate in self-help, and earn positive chronos,

3    so I'll also be looking at whether you met those

4    recommendations.  Starting with your disciplinary -- your

5    classification score and your disciplinary record; your

6    classification score is 19, which is the mandatory minimum

7    for lifers, and your custody level is currently Medium-A.

8    Since your last hearing in 2005, there has been no CDC

9    115s and no 128-As.  Your record of 115s is a total of

10    four, with the last one being in 1990.  All four occurred

11    between 1982 and 1990.  They were disobeying an order,

12    stimulant and sedative use, possession of alcohol, and an

13    inmate in the cell.  So I don't see any violence in those

14    115s.  So you've been disciplinary free since 1990.  You

15    have no 128As or counseling chronos in your entire life

16    term.  Vocationally I've reviewed your file.  I see a

17    number of -- a couple of vocational certifications, as

18    well as considerable work experience.  First of all,

19    there's a vocational Dry Cleaning chrono saying that you

20    participated between 1993 and 1998 and you completed that

21    program; is that accurate?

22          **INMATE NAVARRO:**  Yes.

23          **DEPUTY COMMISSIONER STAR:**  Okay.  Also, there is

24    a certification in vocational Baking, but I couldn't find

25    the date of when you did that.  Do you recall when you did

23

1    time recommended that you remain disciplinary free, that

2    you participate in self-help, and earn positive chronos,

3    so I'll also be looking at whether you met those

4    recommendations.  Starting with your disciplinary -- your

5    classification score and your disciplinary record; your

6    classification score is 19, which is the mandatory minimum

7    for lifers, and your custody level is currently Medium-A.

8    Since your last hearing in 2005, there has been no CDC

9    115s and no 128-As.  Your record of 115s is a total of

10   four, with the last one being in 1990.  All four occurred

11   between 1982 and 1990.  They were disobeying an order,

12   stimulant and sedative use, possession of alcohol, and an

13   inmate in the cell.  So I don't see any violence in those

14   115s.  So you've been disciplinary free since 1990.  You

15   have no 128As or counseling chronos in your entire life

16   term.  Vocationally I've reviewed your file.  I see a

17   number of -- a couple of vocational certifications, as

18   well as considerable work experience.  First of all,

19   there's a vocational Dry Cleaning chrono saying that you

20   participated between 1993 and 1998 and you completed that

21   program; is that accurate?

22           INMATE NAVARRO:  Yes.

23           DEPUTY COMMISSIONER STAR:  Okay.  Also, there is

24   a certification in vocational Baking, but I couldn't find

25   the date of when you did that.  Do you recall when you did

24

1    that, sir?

2              INMATE NAVARRO:  That was in 1984.

3              DEPUTY COMMISSIONER STAR:  Was it a program or

4    just a course.

5              INMATE NAVARRO:  It was a vocational program.

6              DEPUTY COMMISSIONER STAR:  And do you remember

7    how many it was that you completed?

8              INMATE NAVARRO:  When I completed the program, it

9    was over 2,000 hours.

10             DEPUTY COMMISSIONER STAR:  Two thousand hours.

11             INMATE NAVARRO:  I was in CTA, I think.

12             DEPUTY COMMISSIONER STAR:  Thank you.  I did see

13   the certificate in there.  It wasn't dated and didn't show

14   the hours.  And then I see considerable recent experience

15   in Prison Industries, Mill and Cabinet program, including

16   your current assignment, which I'll go over in a second.

17   And it looks like about eight years in that program?

18             INMATE NAVARRO:  Yes.

19             DEPUTY COMMISSIONER STAR:  Okay.  So you appeared

20   to have developed considerable vocational skills and work

21   experiences that appear to be marketable.  Anything I

22   missed in the vocational area?

23             INMATE NAVARRO:  No, ma'am.

24             DEPUTY COMMISSIONER STAR:  Okay.  Let's move onto

25   your education and Commissioner Bryson has already covered

25

1   some of this.  You have pre-prison experience, work

2   experience, in the laundry field.  And you got a GED in

3   1998.  Where you at, at that time?

4          INMATE NAVARRO:  In 1987, in Vacaville.

5          DEPUTY COMMISSIONER STAR:  Was it?  At Vacaville?

6   Okay.

7          INMATE NAVARRO:  I was doing CAT-T Program

8   (phonetic).

9          DEPUTY COMMISSIONER STAR:  Were you?  I saw your

10  GED in here.  Let me just take a quick look at it.  Okay,

11  1987.  And your current work assignment is a PIA Machinist

12  in Mill and Cabinet, which you've been doing in different

13  assignments for the last eight years, right?

14         INMATE NAVARRO:  Yes.

15         DEPUTY COMMISSIONER STAR:  But not necessarily

16  the Machinist.  There is a current, fairly recent, work

17  supervisor's chrono called a CC-101 which rates you.  It's

18  dated April 2nd, 2007, and it says you are performing

19  above average to exceptional work in that assignment, so

20  congratulations.  You are to be commended on that, sir.

21  Okay, now in terms of your self-help group participation,

22  I'm referring to the counselor's report and your Central

23  File.  There is well-documented participation with

24  quarterly chronos that you're participating in Narcotics

25  Anonymous and apparently you've been a long-term

26

1    participant of that.  You've been participating

2    continuously since the last hearing, from what I can see,

3    and you've been a long-term participant.  Do you remember

4    the year you started, Mr. Navarro?

5        INMATE NAVARRO:  Oh, way back, when they started

6    NA.  At first, they only had AA in the beginning.

7        DEPUTY COMMISSIONER STAR:  Yeah, and did you go

8    to that AA before the NA?

9        INMATE NAVARRO:  Yes, ma'am.  I've done a few

10   years of AA and then when they started NA, I started going

11   to NA.

12       DEPUTY COMMISSIONER STAR:  Okay.  Do you practice

13   the 12 Steps, sir?

14       INMATE NAVARRO:  Well, not really, but I always

15   go.

16       DEPUTY COMMISSIONER STAR:  You go?

17       INMATE NAVARRO:  Yeah.

18       DEPUTY COMMISSIONER STAR:  What do you feel you

19   get out of it?

20       INMATE NAVARRO:  I get a lot, not using drugs.

21       DEPUTY COMMISSIONER STAR:  Okay.  So if I asked

22   you what the 9th Step was, would you be familiar with it,

23   sir?

24       INMATE NAVARRO:  No, ma'am.

25       DEPUTY COMMISSIONER STAR:  Okay.  They don't go

27

1    over them at the meetings?

2          INMATE NAVARRO:  No, they go over them, I just

3    don't learn them.

4          DEPUTY COMMISSIONER STAR:  Okay.  How do you

5    practice it, then?

6          INMATE NAVARRO:  Just stay away from drugs.

7          DEPUTY COMMISSIONER STAR:  Okay.

8          INMATE NAVARRO:  I learn by listening to people.

9          DEPUTY COMMISSIONER STAR:  Okay.  And then also

10   your counselor has provided me a more recent chrono of

11   June 10th, 2007.  It says you have participated in Anger

12   Management at San Quentin, having completed eight of eight

13   sessions between September of 2006 and December of 2006.

14   What led you to participate in this and what did you get

15   out of it, sir?

16         INMATE NAVARRO:  Just being aware to manage my

17   anger a little, try and manage it.

18         DEPUTY COMMISSIONER STAR:  Okay.

19         INMATE NAVARRO:  I was an angry person.

20         DEPUTY COMMISSIONER STAR:  Okay.  Did something

21   recent happen or you just -- did it just become available

22   to you?

23         INMATE NAVARRO:  I wanted to just try it out and

24   see what I could get out of it.  I try things.

25         DEPUTY COMMISSIONER STAR:  Okay.  Did you gain

28

```
 1    any insight from that that you'd like to share?
 2            INMATE NAVARRO:  No, not really.  I know I don't
 3    get angry.
 4            DEPUTY COMMISSIONER STAR:  Yeah.  You feel you've
 5    had an anger problem while you've been incarcerated?
 6            INMATE NAVARRO:  No.
 7            DEPUTY COMMISSIONER STAR:  Okay.  I don't see any
 8    disciplinaries since 1990, so I'm just asking what led you
 9    to get involved at this stage.
10            INMATE NAVARRO:  Just to try it out and see what
11    it was about.
12            DEPUTY COMMISSIONER STAR:  Do you feel anger was
13    a factor -- and again, as Ms. Bryson says, you don't have
14    to answer this, but do you feel it was a factor in your
15    commitment offense?
16            INMATE NAVARRO:  A lot has to do with it, being
17    angry.
18            DEPUTY COMMISSIONER STAR:  And what were you
19    angry at?
20            INMATE NAVARRO:  Just angry.
21            DEPUTY COMMISSIONER STAR:  Okay, were you angry
22    at your family or did you feel life had given you a raw
23    deal or --
24            INMATE NAVARRO:  No, just -- I guess the drugs
25    had a lot to do with it.
```

1    DEPUTY COMMISSIONER STAR:  Okay.  Any other

2    programs, Mr. Navarro, that you've participated in?

3    INMATE NAVARRO:  No, ma'am.

4    DEPUTY COMMISSIONER STAR:  All right.  Let's

5    delve into your most recent psychiatric report.  I'm going

6    to be referring to a report by a Dr. Starrett,

7    S-T-A-R-R-E-T-T, who completed a report for today's

8    hearing.  The report is dated March 22nd, 2007.  Starting

9    with a mental health diagnosis, he reviewed the prior

10   psych reports, reviewed your file, and he gave a

11   diagnosis, which I'm going to read onto the record here,

12   referring to Page 4 of his report, "His diagnostic

13   impression is Axis I, a Polysubstance Dependent in

14   Remission and Treatment."  And let me pause there because

15   I heard you tell Commissioner Bryson that you don't think

16   you have an alcohol problem, but when I read the probation

17   officer's report, sir, it refers to long-term drinking.

18   That never got in the way for you?

19   INMATE NAVARRO:  No, ma'am.

20   DEPUTY COMMISSIONER STAR:  Okay, you never felt

21   your mental state was altered by alcohol?

22   INMATE NAVARRO:  No, ma'am.  I mean, I drank, but

23   I wasn't a heavy drinker.  I drank a beer.

24   DEPUTY COMMISSIONER STAR:  Okay.  Did you not

25   have public intoxication arrests as an adult.

30

 1          INMATE NAVARRO:  Yes, ma'am.  A lot of times I

 2   would drink a beer to cover my drug addictions.  I would

 3   rather get arrested for public intoxication instead of

 4   drugs.

 5          DEPUTY COMMISSIONER STAR:  Okay.

 6          INMATE NAVARRO:  Being under the influence -- I

 7   used alcohol.

 8          DEPUTY COMMISSIONER STAR:  Okay, so are you

 9   saying that when they arrested you for public

10   intoxication, you really were a danger to others and

11   couldn't care for yourself because of the underlying

12   Heroin use or because of the alcohol?

13          INMATE NAVARRO:  No, I was just saying I would

14   cover my being under the influence of Heroin with alcohol.

15          DEPUTY COMMISSIONER STAR:  When they arrested you

16   for public intoxication, did they tell you were a danger

17   or you couldn't care for yourself?

18          INMATE NAVARRO:  No, no, ma'am.

19          DEPUTY COMMISSIONER STAR:  All right.  The reason

20   I went over that, Mr. Navarro, is obviously the doctor's

21   diagnosis is showing Polysubstance Abuse, so they're

22   referring to multiple items here and not just Heroin,

23   although I clearly hear that you feel that you have a

24   Heroin problem only.  Axis II, going back to his report,

25   is Antisocial Personality Currently in Remission, Axis III

31

```
1    is No Diagnosis, Axis IV is the Incarceration for the Life

2    Term, and Axis V is his functioning score which is GAF

3    score of 80.  Now the doctor does a risk assessment and

4    I'm going to refer to his risk assessment, which is

5    derived from Page 7 of his report and he does three

6    assessments, including an overall assessment.  First of

7    all, under what we call an Historical Assessment, and he

8    states that you are in the moderate range for propensity

9    of violence and he bases this on your age, your criminal

10   record, your unstable relationships, that you didn't have

11   a career, that you were a substance abuser, and you had

12   early adjustment problems and you had failed prior

13   supervisions.  Then he goes and does a second rating based

14   on a clinical rating and your insight into your behavior.

15   There he rates you low, but he -- low range and his

16   propensity for future violence, however, he makes a

17   statement that he feels there's a certain level of

18   unpredictability on this factor based on the fact that the

19   inmate refused to discuss the crime.  And then the third

20   rating is risk management.  He gives you a low range on

21   this and states that he does feel you need to develop

22   community aspects of parole plans more thoroughly than

23   what he saw.  And his overall rating was a low range when

24   compared to similar inmates.  And his overall risk

25   assessment is also -- he concludes that you've moved from
```

32

1    the moderate range to the low range when compared to

2    certain inmates.  There is a -- again, qualifying that by

3    saying there is a certain amount of unpredictability in

4    this rating due to the fact that the inmate continues to

5    refuse to discuss his case.  And because of -- we don't

6    have a prisoner's version, I do think it's important that

7    I refer to Page 4 of the doctor's report where he did try

8    to review with you the crime and I'm going to quote from

9    the middle of Page 4:

10              "When asking the inmate why he participated

11              or got involved in this crime, the inmate

12              states he does not like to talk about it.

13              He says he was convicted.  The inmate states

14              he refuses to think about it.  He said,

15              quote, it happened, everyone got hurt, end

16              of quote.  He did not want to talk about it.

17              The inmate states that he feels bad about

18              what happened.  He cannot change it.  He

19              said, quote, it's been a long time, I don't

20              like to talk about it, end of quote.  When

21              asking the inmate what has changed about him

22              so something like this would not happen

23              again, he says, quote, I'm getting old, I'm

24              wiser, I realize my mistakes.  Most of my

25              problems were drugs and alcohol.  I don't

33

1          use anymore, end of quote.  When asking the

2          inmate why he had problems acting out as a

3          juvenile young man, the inmate states he

4          liked the lifestyle at the time, he was

5          attracted to the drugs.  He says he was

6          hanging out with the crowd."

7     All right, have you reviewed this report, Mr. Navarro?

8          INMATE NAVARRO:  Yes, ma'am.

9          DEPUTY COMMISSIONER STAR:  Do you agree with the

10    doctor's conclusion?

11         INMATE NAVARRO:  Some of it.

12         DEPUTY COMMISSIONER STAR:  Okay, what do you

13    disagree with?  Is there something you would like to

14    comment on or do you feel you misinterpreted --

15         INMATE NAVARRO:  No, not really.

16         DEPUTY COMMISSIONER STAR:  Okay.  You understand

17    the doctor has qualified his assessment of you because you

18    haven't talked and he can't assess your insight into the

19    crime?  You understand that?

20         INMATE NAVARRO:  Yes.

21         DEPUTY COMMISSIONER STAR:  Okay.  How do you feel

22    about the victim today, Mr. Navarro?

23         INMATE NAVARRO:  I feel bad for him and for his

24    family.

25         DEPUTY COMMISSIONER STAR:  Okay.

34

1           INMATE NAVARRO:  That's all I can say.

2           DEPUTY COMMISSIONER STAR:  The 12 Steps addresses

3    making amends.  Have you thought about that as it pertains

4    to this victim and his family?

5           INMATE NAVARRO:  No, not really.  I don't even

6    know where his family lives.

7           DEPUTY COMMISSIONER STAR:  Okay.  Do you feel you

8    owe amends to anyone, other than the victim?

9           INMATE NAVARRO:  There are a lot of people.

10          DEPUTY COMMISSIONER STAR:  And have you made any

11   efforts in following and practicing the 12 Steps?

12          INMATE NAVARRO:  No.

13          DEPUTY COMMISSIONER STAR:  Okay, and why would

14   that be?

15          INMATE NAVARRO:  Because I haven't done it.

16          DEPUTY COMMISSIONER STAR:  I did take a look at

17   the prior two psych evaluations.  There was one in 2004 by

18   Dr. Bencich, B-E-N-C-I-C-H, who didn't give any ratings on

19   you and Dr. Starrett also reviewed it and his review he

20   indicated no ratings and didn't really -- it wasn't risk

21   assessments, weren't utilized in dangerousness was not

22   discussed.  And I wanted to take a look at his statements

23   regarding your insight into the commitment offense and he

24   states -- and now I'm reading from the top of Page 3:

25           "The inmate reports his addictive behavior

35

```
 1                     has been a life-long problem.  He realizes
 2                     it was a major contributing factor to his
 3                     criminal behavior as a young man and
 4                     culminating in his controlling case.  The
 5                     inmate has insight into discussing the
 6                     reasons for his criminal behavior as a
 7                     youth.  The inmate was very insightful in
 8                     discussing his addictive behavior and its
 9                     impact on his life.  The inmate understands
10                     the need for long-term treatment.  The
11                     inmate continues to refuse to discuss his
12                     crime.  He does not really want to talk
13                     about the reason why he's refusing to talk
14                     about this crime.  The inmate states it
15                     happened, everyone got hurt behind it, I
16                     don't want to talk about it.  The inmate has
17                     participated in substance abuse for over 20
18                     years.  And the inmate at one time was very
19                     active in therapeutic treatment while at
20                     CMC.  All this is to the inmate's credit."
21      Okay, any other -- anything else about the doctor's report
22      that you'd like to talk about?
23                     INMATE NAVARRO:  No.
24                     DEPUTY COMMISSIONER STAR:  Okay.  I'm going to
25      ask you to turn your attention to Commissioner Bryson.
```

36

1 **PRESIDING COMMISSIONER BRYSON:** What would be
2 your residence plans if you were to parole?

3 **INMATE NAVARRO:** Well, I was going to parole back
4 to my mom's house at (inaudible).

5 **PRESIDING COMMISSIONER BRYSON:** Do you have any
6 documentation to support that she would welcome you into
7 the home?

8 **INMATE NAVARRO:** Well, I was going to go with my
9 old letters because everything's the same. The job offer,
10 my brothers, everything's the same. Nothing's changed.

11 **PRESIDING COMMISSIONER BRYSON:** Okay. But you
12 must understand because you've been through a number of
13 Parole Consideration Hearings, that the documentation is
14 pretty important and even a year can change everybody's
15 perspective and their desires, so it's important to have
16 current material. Counsel, do you have something that you
17 want to add?

18 **ATTORNEY GUNNING:** I would like him to explain to
19 why, in a little more detail, as to why he didn't get
20 these -- he does have these old letters here. There's a
21 reason he felt that he wasn't going to make contact with
22 his family recently.

23 **PRESIDING COMMISSIONER BRYSON:** Why is that, sir?
24 **INMATE NAVARRO:** No, I'm all right, I don't want
25 to talk about that.

37

1          **ATTORNEY GUNNING:**  Then I'll tell them.  Someone

2     in the inmate's family died recently and he didn't want to

3     trouble his family at that particular time when they were

4     grieving, so I understand his point, it's not for lack of

5     contact.  I think he just didn't want to bother his

6     family.

7          **PRESIDING COMMISSIONER BRYSON:**  And this job that

8     you're referring to would be with your brother, Raymond

9     Navarro, apparently the director of this maintenance

10    operation and transportation facility in Farmersville

11    Unified School District in Exeter, California.  Was he

12    offering you a job?

13         **INMATE NAVARRO:**  Yes, ma'am.

14         **PRESIDING COMMISSIONER BRYSON:**  And what would

15    you do?

16         **INMATE NAVARRO:**  Well, I would be maintenance.

17         **PRESIDING COMMISSIONER BRYSON:**  It also mentions

18    that you've been given the opportunity to work as a

19    professional landscaper for Mr. Alfredo Munoz; is that

20    still available?

21         **INMATE NAVARRO:**  Yes, ma'am.

22         **PRESIDING COMMISSIONER BRYSON:**  Now it says you

23    were in the process of obtaining a support letter; did

24    that letter ever come forward?

25         **INMATE NAVARRO:**  No, ma'am.

38

 1        **PRESIDING COMMISSIONER BRYSON:**  Okay.  All right,

 2   Counsel, is there anything else that I've missed?

 3            **ATTORNEY GUNNING:**  No, ma'am, nothing.

 4        **PRESIDING COMMISSIONER BRYSON:**  All right.  We

 5   sent out 3042 Notices.  These notices go out to agencies

 6   having a direct interest in your case.  We have a

 7   representative from the Tulare County District Attorney's

 8   Office present who will have the opportunity to make a

 9   statement regarding parole suitability prior to the

10   conclusion of this hearing.  And Commissioner Star, is

11   there any issue that needs to be discussed at this time?

12        **DEPUTY COMMISSIONER STAR:**  No, there's nothing at

13   this time.

14        **PRESIDING COMMISSIONER BRYSON:**  All right.  Does

15   the District Attorney have questions of this inmate?

16        **DEPUTY DISTRICT ATTORNEY KAELBLE:**  Yes, I do.

17   One of the questions that I wanted to find out if you

18   could ask the inmate, with regards to working for a school

19   district, does he have any information as to whether

20   having felonies on his record would affect their ability

21   to hire him?

22        **ATTORNEY GUNNING:**  Do you understand the

23   question?

24        **INMATE NAVARRO:**  Yeah.

25        **ATTORNEY GUNNING:**  She said if you're going to

39

1    work for a school district --

2        INMATE NAVARRO:  Yeah, they would probably check.

3    I mean, that's not the only job.  I can get different

4    jobs.

5        PRESIDING COMMISSIONER BRYSON:  But the question

6    is, did you check --

7        INMATE NAVARRO:  Yeah.

8        PRESIDING COMMISSIONER BRYSON:  -- did you check

9    into that, though (overlapping).

10        INMATE NAVARRO:  Yes, they probably wouldn't hire

11    me.

12        PRESIDING COMMISSIONER BRYSON:  Okay, thank you.

13        DEPUTY DISTRICT ATTORNEY KAELBLE:  Another

14    question I wanted to find out about was what's going to

15    stop this inmate from using drugs again once he is back in

16    the community and back around the influences that

17    surrounded him previously when all this happened?

18        INMATE NAVARRO:  Well, I know for myself, I'm not

19    using drugs.  I'm done with them.

20        DEPUTY DISTRICT ATTORNEY KAELBLE:  And another

21    question I had, in the 2000 psychological report, the

22    inmate had made some reference to not wanting to be

23    paroled to Tulare County because of the bad influences

24    there.  What has changed between 2000 and now to make him

25    believe that those bad influences are no longer there?

40

1       **INMATE NAVARRO:**  I don't recall ever saying that

2  statement, but I guess it's there.

3       **DEPUTY DISTRICT ATTORNEY KAELBLE:**  And back at

4  the time when -- prior to this incident, when you were

5  using drugs, where did this inmate get this money for the

6  drugs since he wasn't actually employed most of the time?

7  He had some seasonal employment and temporary employment.

8       **ATTORNEY GUNNING:**  Can I have one second?

9       **PRESIDING COMMISSIONER BRYSON:**  Go ahead.

10       **ATTORNEY GUNNING:**  With all due respect, I've

11  indicated to my client that I don't think he should answer

12  that question, so he's not going to.

13       **PRESIDING COMMISSIONER BRYSON:**  All right.

14       **DEPUTY DISTRICT ATTORNEY KAELBLE:**  One other

15  question.  I just wanted to find out whether the inmate

16  was currently or previous associated with a Northern gang

17  called Varrio Farmas Catorce based on the tattoo that he

18  has on his forehead, which is consistent with the tattoos

19  that gang members in Farmersville who belong to that gang

20  do have.

21       **PRESIDING COMMISSIONER BRYSON:**  I believe, sir,

22  you do have a tattoo on your forehead.

23       **ATTORNEY GUNNING:**  Okay, just for the record,

24  he's already asked -- he's been asked that question and

25  he's answered it.  He is not involved in a gang.

41

1        DEPUTY DISTRICT ATTORNEY KAELBLE:  And just on
2    that -- in that same area, whether or not -- I saw some
3    reference in some of the materials in the file that there
4    have been discussion about whether or not he was going to
5    have that tattoo removed and if he's made any decisions
6    with regards to that.
7        INMATE NAVARRO:  Yes, if I ever get out, I'm
8    going to have it removed.
9        DEPUTY DISTRICT ATTORNEY KAELBLE:  I don't have
10   any other questions.
11       PRESIDING COMMISSIONER BRYSON:  All right.
12   Counsel, do you have any questions at this time?
13       ATTORNEY GUNNING:  I don't, thank you.
14       PRESIDING COMMISSIONER BRYSON:  So, what's the
15   tattoo on your forehead for, then?
16       INMATE NAVARRO:  Just dumb.
17       PRESIDING COMMISSIONER BRYSON:  Okay.  Have you
18   heard the saying, once a doper, always a doper?
19       INMATE NAVARRO:  Yes.
20       PRESIDING COMMISSIONER BRYSON:  Heroin is a
21   terrible drug.
22       INMATE NAVARRO:  I know it is.
23       PRESIDING COMMISSIONER BRYSON:  It's incredibly
24   (inaudible).  Do you think that you have the tools to go
25   out there and not use again?

42

1        **INMATE NAVARRO:**  I know -- I know I have for

2    myself.

3        **PRESIDING COMMISSIONER BRYSON:**  All right.  I'd

4    like to provide the District Attorney to make a closing

5    statement.

6        **DEPUTY DISTRICT ATTORNEY KAELBLE:**  With regards

7    to the facts the Board has already gone over the general

8    facts relating to this case.  This was a very cruel and

9    callous crime.  There was planning involved in the crime.

10   Since this inmate and two other participants had to get

11   together and come up with this plan, they had to obtain

12   the weapons that were used in both this attack on the

13   victim who later passes away, which was the pipe, and they

14   also -- the other codefendants also obtained a knife which

15   was later used against the second victim in the attempted

16   robbery.  In this case, the reason for the attack was

17   relatively trivial.  Basically the inmate and the

18   codefendants needed more money because they wanted to get

19   more Heroin, and as a result, an innocent person was

20   killed.  This was a cruel and callous crime based on the

21   fact that there were three defendants against just one

22   innocent victim on the street and the victim had to suffer

23   blunt force trauma to the head significant enough to

24   render -- to result in his death.  He didn't die

25   immediately.  It appears from the officer's description

43

1    that he went into shock and was making involuntary
2    movements as he lay on the street.  This was a calculated
3    dispassionate crime.  This was not just and impulsive
4    decision where the defendant got -- where the inmate got
5    involved in a confrontation with somebody and then that
6    resulted in a fight.  This was a planned act where they
7    were going to commit a robbery and if the victim put up a
8    fight, they were going to use force in order to get what
9    they wanted.  He presents a significant danger to society
10   and he should remain in custody.  With regards to his
11   history, that the Board has gone over his history, his
12   criminal history from the time he was 15 until the time he
13   was 23 at the time of the murder, and he's had numerous --
14   there were numerous attempts to rehabilitate him.  He was
15   put on probation a number of times, both as a juvenile and
16   as an adult.  He has violent assaultive behavior in his
17   past with the 245 that he had committed as an adult.  With
18   regards to his work history, we don't really have any
19   solid work history on him and either that indicates that
20   he was getting money from some other illegal sources
21   during that time in order to pay for his drug habit or his
22   family was enabling him by proving him money that allowed
23   him to go on and use drugs, even though they knew he had
24   this history that he'd been getting arrested numerous
25   times and this is the same family he wants to go back and

44

 1    live with when he is paroled.  Furthermore, I know that
 2    earlier the Board indicated that we didn't have a
 3    prisoner's version of the events.  There was a 1987 report
 4    and on Page 1 of that report, there was mention that the
 5    prison indicated that the victim had been murdered because
 6    he started to struggle with and resist their attempts to
 7    rob him.  Basically, he was blaming the victim at that
 8    time and we don't have anything more current to indicate
 9    what he feels now.  He indicates that he feels remorse,
10    but he doesn't really elaborate on that, so we don't
11    really know what he means by that statement.  With regards
12    to the psychological report from 2007, there are some
13    statements which the doctor uses in that report that are
14    not actually based in fact.  He indicates in his report
15    that the inmate's been involved in NA for 26 years.  If
16    you look through some of the other reports, in 1987, that
17    was when the Board told him to start attending NA meetings
18    and in the current lifer prison evaluation report, it
19    indicates on the bottom of Page 2 that he actually started
20    attending NA in July of 1991.  That would actually make it
21    16 years.  Furthermore, in a 1998 report, it indicates
22    that the Board realized that from January of '98 to July
23    of '98, he stopped attending meetings and the Board told
24    him he needs to go back.  He hasn't been taking these NA
25    meetings and AA meetings very seriously.  He's been

45

1    attending all these years and, as he even stated today, he

2    really doesn't know what the 12 Steps are and he doesn't

3    really do anything to follow-up with them.  He just

4    attends those meetings basically and that's basically a

5    way to spend his time.  That's not really something that

6    he's taking to heart and that he's gaining any insight

7    from.  Furthermore, the psychological report, as the

8    examiner explains, he can't really draw any conclusions

9    with regards to the inmate's insight because the inmate

10    doesn't want to discuss the facts and doesn't want to

11    discuss how this has changed him.  We don't have any idea

12    about whether he's internalized the things he's learned,

13    whether he's learned anything at all.  And if he hasn't

14    really learned anything, he would be a danger to society

15    because these same things that happened back in 1997 could

16    happen again.  Basically the doctor states that he is a

17    low risk because he's been attending these classes, but

18    he's basically going to speculation and making assumptions

19    to draw that conclusion.  There are no facts in the report

20    to indicate that the inmate himself can provide

21    information to say that he has the insight that he takes

22    responsibility, that he's not putting the blame on the

23    codefendants or putting the blame on the victim, or just

24    trying to blame drugs and alcohol in general.  He needs to

25    understand what he needs to do to become a responsible

46

1    citizen to avoid this situation in the future.

2    Furthermore, the doctor indicates in the report that in

3    order remain free from violence, he needs to stay away

4    from drugs and he needs support from the community.  We

5    don't have letters from his family, from friends, from any

6    organization to say that they're going to support him and

7    they're going to help him and that they're going to be

8    there for him either socially or even financially.  We

9    don't really know how he's going to be able to get on when

10   he -- if he was to be released and we don't really have

11   any details about a parole plan.  Even the doctor's report

12   indicates that he needs more details in his parole plan

13   and he needs some sort of community support.  And if you

14   look back at the 2004 report, the inmate specifically told

15   the examiner at that time that self-help groups are not

16   for him and that he feels that he doesn't need them.  So

17   it seems that that's in direct contradiction of what this

18   doctor is saying this inmate would need in order to

19   succeed if he was to be released.  With regards to the

20   tattoo, the inmate's denying any association with a gang,

21   however, there's really no other logical explanation for

22   why he has a tattoo for Farmas, which is consistent with a

23   gang that has existed in the Farmersville area for the

24   past 30 years and where gang members do have that same

25   tattoo for Varrio Farmas Catorce.  There are a lot of

47

1    southern gang members in the (inaudible) area in
2    Farmersville as well and that would lead to significant
3    problems.  There's a lot of gang activity in the city of
4    Farmersville.  If he was to be released, there is an
5    unreasonable risk of danger and there is a danger -- a
6    risk of harm to society.  The final thing I wanted to talk
7    about was the parole plan.  We don't have any letters to
8    support anything.  We don't know who else lives in this
9    residence with the mother.  We don't know if any of these
10   people are in any way involved with drugs or have any sort
11   of -- if there are any sort of financial issues that may
12   come up if he was to live there.  We don't have any
13   letters to verify any job offers.  We don't know if he's
14   going to have access to a vehicle to get to a job.  We
15   don't know how much he's going to be getting paid, whether
16   that's going to be enough money to help him to pay the
17   bills at the residence with his elderly mother.  And we
18   also don't know anything about what sort of employment
19   this would be, whether it would be part-time, full-time,
20   and what sort of hours and whether he would be able to
21   attend NA meetings, AA meetings in the area based on that.
22   He has mentioned in a few of the reports that he has
23   alternative occupations that he may be able to get
24   involved with, such as dry cleaning.  Farmersville is a
25   very small community.  There are no dry cleaning stores in

48

1    the city of Farmersville.  He'd need transportation to get

2    to a larger city, like Visalia, which is approximately

3    eight miles away.  And we don't have any indication about

4    whether he'd be able to do that.  He hasn't really done

5    the research to find out whether somebody would really

6    give him a job based on his criminal history and based on

7    everything else that has been going on.  Finally, we're

8    just asking that the Board keep this inmate in custody

9    based on the fact that he does not have an adequate parole

10    plan, based on the facts of the crime, based on his

11    criminal history, and the fact that he is a risk to the

12    public.  And we are asking that he be denied parole for at

13    least a few more years.

14          PRESIDING COMMISSIONER BRYSON:  Counselor, I'd to

15    invite you to make a closing statement.

16          ATTORNEY GUNNING:  Thank you.  As already

17    indicated, this is Mr. Navarro's 16th overall hearing and

18    the last time he did receive a two-year denial, as already

19    noted.  His MEP for this offense was the 15th of May of

20    1984.  He is presently 53 years old and from the

21    standpoint of recidivism, that's important to keep in

22    mind.  He did commit his offense when he was 23, over 30

23    years ago.  As to the commitment offense itself, as

24    already indicated, this occurred in 1977 when he was 23

25    years old.  The facts are that he and his brother and Mr.

49

1      Garcia accosted and ended up killing Mr. Gonzales.  The

2      facts are also clear that the intent was to rob and that

3      it was Mr. Garcia who elected to pick up a pipe and strike

4      Mr. Gonzales with that pipe and that's based on testimony

5      by, apparently, a witness.  So this is a felony murder.

6      That's important from the standpoint of whether or not

7      Mr. Navarro's conduct at the time of the commitment

8      offense exceeded the minimum necessary for first degree

9      murder and the elements contained therein.  Now the answer

10     is, I don't think it does.  Does that indicate that other

11     than accosting Mr. Gonzales, holding him down, anything

12     other than that, we understand his intent was to rob.

13     He's admitted that.  He had a drug problem and he wanted

14     money.  But again, this is a felony murder and the case

15     law is pretty clear on this in this regard.  When you're

16     looking at somebody who has been incarcerated for, in this

17     case, 28 years plus for this offense, again, if you were

18     to conclude that his conduct seemed (inaudible), I don't

19     think it did, the next step is to determine whether or not

20     Mr. Navarro is presently a reasonable risk to society as

21     he sits in front of you today and I would submit he is

22     not.   That is for you to conclude, but when you look at

23     his record in total, he is not a violent individual.  He

24     is a drug addict and he may have an alcohol problem in the

25     past, but he is not a violent person.  Pre-conviction

50

1    factors have already been addressed.  The alcohol issue,

2    drug issue, I'm not going to go through that again.  You

3    have a criminal history.  There was one incident of

4    violence, that was back in 1972.  That would be 35 years

5    ago -- 35-plus years ago.  That's the only reference in

6    his record that I could see of any kind of violence

7    outside of the commitment offense.  Again, he was not the

8    individual who actually struck Mr. Gonzales at the time of

9    the offense.  He has a -- from a post-conviction

10   standpoint, he has an excellent work history.  He's

11   developed marketable skills that he didn't have

12   beforehand.  He has apparently a very good work ethic and

13   that will bode well for him upon release.  And as the

14   Board is well-aware, you don't need letters of support.

15   There's nothing in Title 15 that indicates that.  I

16   understand the Boards asks that, but there's nothing in

17   Title 15 to require that.  He has marketable skills,

18   they're viable, he does have old letters of support from

19   his family.  There's nothing to indicate that they have --

20   based on what I've seen or heard, that they are no longer

21   in support, so I would submit that the same support that

22   they've been providing him since 1983 are still in place.

23   The only reason he didn't go and request new ones was

24   because of the fact he lost someone in the family and he

25   did want to bother his family.  He has participated in NA

51

```
 1    for an extensive period of time.  And, granted, he not
 2    know them verbatim, but I do think he walks that walk.
 3    You don't see any write-ups from the standpoint of
 4    disciplinaries since 1990.  That is 16, 17 years now,
 5    approximately, without a write-up, so I do think that he
 6    understands the importance of staying away from narcotics.
 7    They are accessible to him in here and he's decided not to
 8    take advantage of that.  I do think he takes his problems
 9    with narcotics seriously.  I would note for the record
10    that again, as far as the insight, the doctor did point
11    out -- as Dr. Starrett did point out from the standpoint
12    of insight that -- and I quote on Page 3:
13              "The inmate has insight into discussing the
14              reasons for his criminal behavior as a
15              youth.  The inmate is very insightful in
16              discussing his addictive behavior and its
17              impact on his life.  The inmate understands
18              the life-long need for treatment, unquote."
19    So I think based on the doctor's opinion -- professional,
20    he does understand the dynamics of drug addiction and its
21    role -- the role it played in his criminal activity and
22    the commitment offense.  He has his education, he has his
23    vocation skills, he has participated in self-help.  He has
24    marketable skills in a variety of areas, so I think in
25    total, he meets an awful lot of criteria for suitability.
```

52

1   That being said, I'm go ahead and submit.

2          PRESIDING COMMISSIONER BRYSON:  Thank you.  Sir,

3   are you suitable for parole?

4          INMATE NAVARRO:  Yes, ma'am.

5          PRESIDING COMMISSIONER BRYSON:  Why?

6          INMATE NAVARRO:  I'm ready to go home.

7          PRESIDING COMMISSIONER BRYSON:  Thank you.  Thank

8   you for your remarks.  We'll now recess for deliberation.

9   The time is 9:57.

10                       R E C E S S

11                        --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

53

1      CALIFORNIA BOARD OF PAROLE HEARINGS

2              D E C I S I O N

3      PRESIDING COMMISSIONER BRYSON:  Thank you, the

4  time is now 10:36.  All parties have returned to the room

5  for the decision in the matter of Lionel Navarro.  Sir,

6  the Panel reviewed all information received from the

7  public and from you and relied on the following

8  circumstances in concluding that you are not yet suitable

9  for parole and would pose an unreasonable risk of danger

10  to society and threaten public safety if released from

11  prison.  This offense, sir, was carried out in an

12  especially cruel and callous manner.  On November 10th of

13  1977, a Farmersville Police patrol officer recognized the

14  inmate, Andy Navarro, and Carlos Garcia running across a

15  vacant lot.  Looking in the direction they were from, he

16  saw a body lying in the middle of the road.  Dispatching

17  another officer to investigate patrol and pursuit, the

18  suspect entered the Navarro residence.  Multiple victims

19  are attacked or killed in the same incident.  At the

20  Navarro residence, an officer saw Andy Navarro walking

21  alongside the home with bloodstains on his shirt,

22  carrying a brown Pendleton shirt wrapped around a hunting

23  knife with a ten-inch blade and bone handle.  Found at

24  the location were two brown leather wallets, one was the

25  NAVARRO, LIONEL   B-91886   DECISION PAGE 1  07/24/07

54

```
 1   victim's, one was Andy Navarro's, and there was

 2   identification of a check stub belonging to the victim.

 3   This offense was carried in a dispassionate and

 4   calculated manner.  This victim was attacked by three men

 5   for the purpose of robbery.  The victim was hit on the

 6   head with a metal pipe approximately three feet long,

 7   which was found at the scene.  He was transported to

 8   Delta Hospital and died several hours later.  Sir, this

 9   Panel, contrary to your attorney, does believe in the

10   fact that you do have a violent history.  First of all,

11   you have a juvenile history of burglary, an adult history

12   of public intoxication, possession of a switchblade,

13   assault with a deadly weapon.  You do have a history of

14   prior criminality that shows an escalating pattern of

15   criminal conduct.  You also were very frank with this

16   Panel and you are commended for that in that you do have

17   a drug abuse history, and by your own testimony, starting

18   at the age of 13, involving both Heroin and alcohol

19   (inaudible) probation and adult probation and then

20   spending time in jail, as far as -- including a couple of

21   commitments to a juvenile ward, you were declared a ward

22   of the court as a juvenile a couple of times.  So you do

23   have a significant criminal history and you really

24   haven't discussed very much about that criminal history

25   NAVARRO, LIONEL    B-91886    DECISION PAGE 2   07/24/07
```

55

1    today but it's clear on the face of it.  As to your

2    institutional behavior, you have worked well and you are

3    to be commended for that.  Most recently in PIA in Mill

4    and Cabinet where you've been approximately eight years.

5    That seems to be a good match for you.  Currently you're

6    a Machinist there and you've received above-average to

7    exceptional work reports, so obviously they count on you

8    in that job.  As to your education, you received your GED

9    in 1987.  There has been vocational upgrading since that

10   time.  As to vocations, you have two vocational

11   certifications; one in Dry Cleaning, in which you were

12   involved from 1993 to 1998, and Baking, you achieved your

13   Baking certification in 1984.  As to your self-help, this

14   is where you've been very limited in your programming.

15   You have attended first AA and then NA fairly

16   continuously.  I would say almost continuously up until

17   the present time.  What's unclear is that you've really

18   derived very little from it.  You haven't internalized

19   the steps.  You have been really unable to discuss what

20   you've learned, if anything, and your whole answer to how

21   you're going to stay away from drugs is "I won't use

22   drugs."  You did take an Anger Management course in 2006

23   and were involved in the CAT-T Program (phonetic).  The

24   Anger Management, sir, we would say is very long in

25   **NAVARRO, LIONEL    B-91886    DECISION PAGE 3   07/24/07**

56

```
1    coming and it's good that you tried it, but that really
2    constitutes the bulk of your self-help.  Basically being
3    in some sort of attendance in NA and not absorbing very
4    much from it, apparently.  As to your 115s, you have
5    four, to your credit with no violence, and the most
6    recent was in 1990, and no 128As, so you've had a
7    significant period of time in which you continue to
8    display positive change as regards disciplinaries.  As to
9    the psychological report dated March 22nd of 2007 by
10   Dr. Richard Starrett, Dr. Starrett is not totally
11   supportive of your parole.  Basically, Dr. Starrett, this
12   Panel feels, failed to address contradictions between
13   prior statements and other records and statements that
14   he, himself has made.  We are, in fact, going to submit a
15   request for a new psychological evaluation.  Basically,
16   you are denying the alcohol involvement as basically
17   saying you're saying that was only a cover for your
18   Heroin addiction.  And we don't feel you're an alcoholic,
19   but you're an addict, a recovering addict at that.  But
20   he does not reconcile that with the need for a structured
21   drug treatment program and you've made no plans for a
22   drug treatment program.  Also seemingly contradicted is
23   his feeling that you in fact have insight and remorse and
24   basically, we have no evidence of that.  We don't
25   NAVARRO, LIONEL   B-91886   DECISION PAGE 4   07/24/07
```

57

```
 1   evidence of that in the file, sir, and we certainly
 2   didn't have any evidence of your insight or remorse for
 3   today.  As to parole plans, you presented no documents
 4   for current parole plans and you don't appear to have
 5   realistic parole plans.  Paroling back to an area that is
 6   still rife with gangs and drugs, so you may feel that
 7   you're too old to be a gang member, still the drugs are
 8   rife in that area and it's not clear that that would be
 9   the best plan for you and basically you don't have any
10   documentation to support that.  You do appear to have
11   marketable skills as a machinist and your present work in
12   Mill and Cabinet seem to be a very marketable skill.
13   It's questionable that your Dry Cleaning or Baking would
14   be reliable skills that you could fall back on just
15   because you have been so long and they have not been
16   upgraded.  As to Penal Code 3042 responses, responses
17   indicate opposition to finding a parole suitability
18   specifically by the District Attorney of Tulare County.
19   In a separate decision the Hearing Panel finds it is not
20   reasonable to expect a parole be granted at a hearing
21   during the following three years.  This Panel feels, sir,
22   that you are going backwards, not forwards.  And that's
23   why we're calling it out three years.  It's going to take
24   you, if you start today, it's going to take you three
25   NAVARRO, LIONEL   B-91886   DECISION PAGE 5  07/24/07
```

58

1   years of hard work.  Let me explain.  This offense was

2   carried in an especially cruel and callous manner.  On

3   November 10th of 1977, Farmersville Police patrol officer

4   recognized you, Andy Navarro, and Carlos Garcia running

5   across a vacation lot.  Looking in the direction they had

6   come, the patrol officer saw a body lying in the road.

7   He dispatched another officer to investigate.  Meanwhile,

8   he pursued the suspects, that was you, sir, to the

9   Navarro residence.  Multiple victims were attacked,

10  injured or killed in the same incident.  At the

11  residence, an officer saw Andy Navarro, your brother,

12  walking alongside the home with bloodstains on his shirt

13  carrying a brown Pendleton shirt wrapped around a hunting

14  knife, as it turned out, with a ten-inch blade and bone

15  handle.  Found at the location were two brown leather

16  wallets; one of them with the victim's identification and

17  the other with Andy Navarro's identification, and a check

18  stub belonging to the victim.  This offense was carried

19  in a dispassionate and calculated manner.  It was a

20  planned offense.  This gentleman was attacked by three

21  men, and one of them was you, sir, for the purpose of

22  robbery.  The victim was hit on the head with a metal

23  pipe, approximately three feet long and found at the

24  scene.  He was transported to Delta Hospital.  He died

25  **NAVARRO, LIONEL    B-91886    DECISION PAGE 6   07/24/07**

59

1    several hours later.  This victim was abused during this

2    offense.  The officer observed that the victim, Pasquale

3    Gonzales, had partially coagulated blood on his nose and

4    mouth area and mucosa running from the corner of his

5    mouth.  He had a difficult time breathing, so he was

6    alive for a significant period of time after he was

7    beaten.  His hands were continually moving in a stroking

8    manner from his upper chest to the top of his head and

9    back.  These motions were out of control.  He was in the

10   process of dying, sir.  The officer tried to talk with

11   him, but he could not get a response.  The victim felt

12   cold to the touch and appeared to be in shock.  His head

13   was greatly swollen, reflective of the blows to the head

14   from the attack.  This offense was carried out in a

15   manner demonstrating exceptionally callous disregard for

16   human suffering.  You had clear opportunity to cease your

17   participation and the second victim, Marcello Silva,

18   subsequently was robbed at knifepoint.  The motive for

19   this series of crimes was very trivial in relation to the

20   offense.  These were vicious attacks for robbery.  You

21   wanted money for Heroin and you ganged up, basically, a

22   three-to-one ratio, as far as attackers to victims.  You

23   have continued to refuse to discuss the details of the

24   commitment offense and that's your right, sir, but we

25   NAVARRO, LIONEL    B-91886    DECISION PAGE 7   07/24/07

60

1    have no evidence that you take responsibility for this

2    offense and you presented here today with a fairly

3    defiant attitude about the whole situation.  What's

4    clear, sir, is that although you're doing well in some of

5    the programming work-wise, and your engaging with that,

6    there's no evidence that you're engaging in self-help

7    that is really the basis for rehabilitation that would

8    give this Panel assurity that in fact not only have you

9    aged, but that you've matured.  It is your

10   responsibility, sir, to convince this Panel that you in

11   fact would not just be la, la, going out there again and

12   just jumping into drugs again, but that in fact you do

13   have the tools such that when, not if, but when you were

14   tempted to engage in taking Heroin again that you would

15   have some tools to fall back on.  We don't have any

16   evidence of that and you haven't taken responsibility for

17   that.  You haven't internalized the Steps and you also

18   haven't developed documented realistic parole plans.  We

19   also, sir, have seen no remorse.  In fact, it's not clear

20   from any of the paper that in fact you understand the

21   nature and magnitude of the crime you have committed.

22   That brings into question a very logical question of

23   whether you truly do understand.  We are in fact going to

24   request a new psychological evaluation.  We feel that the

25   NAVARRO, LIONEL    B-91886    DECISION PAGE 8  07/24/07

61

1    2007 psychological evaluation fails to address the

2    contradictions between prior statements and the records.

3    You're denying the alcohol and the need for structured

4    drug treatment program, plus your insight and remorse are

5    unknown.  We felt that the doctor in saying you have

6    insight and remorse -- we don't know where he got that

7    because you certainly really didn't discuss it in any

8    detail with him.  You haven't internalized AA/NA steps

9    despite years of attendance.  And overall you continue to

10   have a defiant attitude about making a true

11   rehabilitative effort.  Again, sir, a sign of maturity is

12   taking responsibility for your entire parole effort and

13   you need to do that.  And in denying you parole for three

14   years, we're placing you on the 2010 calendar for your

15   next subsequent hearing.  We recommend no more 115s, that

16   you embrace self-help in a way that will in fact show --

17   that you'll be able to show the Panel the fact you have

18   learned and made strides and that you earn positive

19   chronos.  Again, we're ordering a new psychological

20   evaluation for (inaudible).  Commissioner Star, do have

21   anything?

22        **DEPUTY COMMISSIONER STAR:**  I'm going to reaffirm

23   the Commissioner's statements regarding the self-help

24   efforts.  The Board views it as limited and empty and

25   **NAVARRO, LIONEL    B-91886    DECISION PAGE 9  07/24/07**

62

1    there's no insight in either the NA attendance or the

2    Anger Management that you have gained from this.  And, in

3    fact, Mr. Navarro, a further review of the psych reports

4    show indications of nonacceptance of the NA Steps.  The

5    first Step, nonacceptance for the need for ongoing

6    continued treatment in regard to critical elements of

7    following a substance abuse program.  Your statements

8    were not only contradictory, they were -- as the

9    Commissioner says, somewhat defiant and certainly no

10   insight provided.

11                   A D J O U R N M E N T

12                        --o0o--

13

14

15

16

17

18

19

20

21   PAROLE DENIED THREE YEARS            NOV 2 1 2007

22   THIS DECISION WILL BE FINAL ON:_____

23   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

24   DATE, THE DECISION IS MODIFIED.

25   NAVARRO, LIONEL   B-91886   DECISION PAGE 10   07/24/07

63

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Gita Schmitz, a duly designated transcriber, FOOTHILL
TRANSCRIPTION COMPANY, INC., do hereby declare and
certify under penalty of perjury that I have transcribed
the audio recording which covers a total of pages
numbered 1 - 62, and which recording was duly recorded at
SAN QUENTIN STATE PRISON, SAN QUENTIN, CALIFORNIA, in the
matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of
LIONEL NAVARRO, CDC NUMBER B-91886, on JULY 24, 2007, and
that the foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned audio
recording to the best of my ability.

I hereby certify that I am a disinterested party in the
above-captioned matter and have no interest in the
outcome of the hearing.

Dated August 24, 2007 at Placer County, California.


_Gita Schmitz_

_____
Gita Schmitz
Transcriber
**Foothill Transcription Company, Inc.**